Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# MEMORANDUM OPINION

No. 04-06-00812-CR

Phillip **MARTINEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CR-9680C
Honorable Mark R. Luitjen, Judge Presiding

Opinion by:   Steven C. Hilbig, Justice

Sitting:      Alma L. López, Chief Justice
              Phylis J. Speedlin, Justice
              Steven C. Hilbig, Justice

Delivered and Filed:   July 23, 2008

AFFIRMED

Phillip Martinez was convicted of murder by a jury and sentenced to life imprisonment in the Texas Department of Criminal Justice – Institutional Division. On appeal Martinez argues the trial court abused its discretion by denying his motion to suppress his confession and by admitting a photograph into evidence, and that the evidence is factually insufficient to support the conviction. We affirm the trial court's judgment.

**MOTION TO SUPPRESS**

Martinez filed two pretrial motions to suppress statements he made to police, alleging various grounds for suppressing the statements, including a contention that the statements were obtained in violation of his right to counsel. Martinez asserts the trial court abused its discretion by denying the motions and admitting his statements into evidence. We disagree.

*Background*

Jose Ledesma was found dead in his trailer home with twenty-two gunshot wounds. San Antonio Police Department Detective Timm Angell, the lead investigator assigned to the case, developed evidence that Joe ("Jay") Guerrero and Phillip Martinez were involved in the murder and obtained a warrant for Martinez's arrest. Martinez was arrested and taken to the police station, where he was interviewed by Detective Jimmy Willingham and Detective Angell. A DVD recording of the interview was admitted into evidence at the suppression hearing.

At the beginning of the recorded interview, Detective Willingham read Martinez his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Martinez stated he understood his rights and was waiving them. Martinez initially denied any involvement in Ledesma's murder. After Detective Willingham left the room and Detective Angell took over the interview, Martinez's story began to change. First, Martinez admitted he gave Guerrero some bullets on the day of the murder. He then admitted he went with Guerrero, Guerrero's wife Yolanda, and Martinez's cousin Ernest "Ernie" Garses to Ledesma's trailer. However, Martinez said only Guerrero and Yolanda went in the trailer and that Guerrero shot Ledesma. When Detective Angell accused Martinez of lying, telling Martinez the detective knew two guns were used, Martinez said it was Guerrero and Ernie

who shot Ledesma. Detective Angell responded that he knew Martinez was one of the shooters and that Guerrero admitted that Guerrero had ordered Ledesma killed. Detective Angell urged Martinez to be truthful because that was the only way Martinez could help himself. Then the following exchange took place:[1]

Angell:    He's [Guerrero] admitting to all of that. But you need to tell me the reason why you fired [the gun]. That's what important. Not whether you did or didn't, because I know you did. And I'll be able to prove you did. I think I've showed you I know a whole lot about this case. Tell me the reason why. Let me hear it from your own mouth so that it does you some good.

Martinez:   Without a lawyer. [looking down]

Angell:    I can't help you. You want to call a lawyer, call a lawyer. [gesturing toward telephone] I'm not stopping you.

Martinez:   But, but how can you help me; I mean, well, can I testify against Jay?

Angell:    Absolutely, you're going to have to testify against Jay. Absolutely.

Martinez:   Well what do I get?

Angell:    You're going to be charged with murder tonight, but do you want to be the one who orchestrated it, do you want to be the one . . .

Martinez:   No, no. Jay told me to kill him.

Martinez then said Guerrero had threatened to kill him, his wife, and his children and to "shoot up" his mother's house if Martinez did not kill Ledesma. Martinez admitted that he and Ernie went inside the trailer and shot Ledesma while Guerrero remained outside. He said Yolanda went inside

---

[1]A DVD of the interview was admitted into evidence at the suppression hearing and played for the trial court. A redacted version of the DVD was admitted at trial and played for the jury. However, no transcript of the interview was offered or admitted and the court reporter did not record the substance of the interview played in court. Accordingly, the portions of the interview quoted in this opinion are this court's transcription of the dialogue.

the trailer to make sure they killed Ledesma and she then reported to Guerrero. Martinez told Detective Angell he used a Glock to do the shooting and then gave the gun to someone who reduced it to a small piece of metal. After further discussion about the circumstances of Ledesma's murder, Detective Angell started questioning Martinez about a different murder that occurred in Leon Valley. During that discussion, the following exchange occurred:

Angell:     . . . I'm not saying I don't believe you. We're going to try and find Ernie. Maybe you can take us by and point out his house. It would help. If we get him in here and if Ernie says your life was threatened and you had to do this murder . . .

Martinez:   You know, I mean Jay, Jay's a cold-blooded [expletive] killer, bro. All that sh*t's on Jay bro. I mean, I don't know what else to say. Can I have my lawyer now? Can I have my lawyer? Just do what you gotta do. Take me to jail. You're gonna do it anyway.

Angell:     You're going to go to jail for this murder and there's no way around that. You've got a warrant for your arrest.

Martinez:   But I . . .

Angell:     The judge signed it and you've admitted to doing it.

Martinez:   I didn't admit to . . .

Angell:     Well you did. OK. You don't want to talk anymore. You can call a lawyer if you want to.

Martinez:   So, I mean, Jay ordered this hit. I mean, what is . . .

Angell:     [holding up his hand] I can't talk to you any more. You've asked for a lawyer. I can't talk to you any more. I'm sorry. Unless I read you your rights again and you tell me you don't want a lawyer, I can't talk to you any more.

Martinez:   Well, read me my rights then.

At the suppression hearing, Detective Angell testified he understood Martinez's question, "Can I have my lawyer now?" as meaning "he didn't want to talk to [the detective] anymore." However, Detective Angell also testified he believed Martinez reinitiated contact with him by indicating he wanted to talk some more.

After Martinez told the detective to read him his rights again, Detective Angell left the room to get a rights card. He returned less than a minute later and read Martinez his rights. Martinez indicated he understood his rights and was waiving them. The interview then continued for approximately nine more minutes, during which they discussed the Leon Valley murder and Martinez asked about the evidence the police had against him in the Ledesma murder and what he could do to get the charge reduced. Martinez did not provide any further information about Ledesma's murder. The interview concluded at 1:12 a.m., when Martinez said, "Just end it. Get me a lawyer."

The trial court found Martinez was arrested on a valid warrant and was interviewed while in custody. The court found Martinez was read his rights at the beginning of the interview, that he understood them, and that he knowingly, intelligently, and voluntarily waived his rights. The court found Martinez requested an attorney two times. The first time, Martinez reinitiated contact with Detective Angell. The detective read Martinez his rights again and Martinez understood and waived his rights. The interview continued. The second time Martinez requested a lawyer, the interview ended. The court found all of Martinez's statements on the DVD were voluntary and were not the result of threats or coercion. The court concluded Martinez's confession was admissible. A

copy of the DVD with all questions and statements about the Leon Valley murder redacted was admitted at trial and played for the jury.

On appeal, Martinez argues his right to counsel under the Fifth Amendment to the United States Constitution and article 38.22, section 3 of the Texas Code of Criminal Procedure were violated when questioning continued after Martinez said "without a lawyer" and when Detective Angell continued to address Martinez after he said "Can I have my lawyer now?"[2] Martinez contends all the statements he made after he said "without a lawyer" should have been suppressed.

### *Standard of Review*

We review the trial court's ruling on a motion to suppress evidence for abuse of discretion, using a bifurcated standard. *See Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). We give "almost total deference" to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Id.* at 89. We review *de novo* the trial court's determination of the law and its application of law to facts that do not turn upon an evaluation of credibility and demeanor. *Id.* When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling, so long as it finds some support in the record. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006); *see Moran v. State*, 213 S.W.3d 917, 922 (Tex. Crim. App.), *cert. denied*, 128 S.Ct. 235 (2007). We will uphold the trial court's ruling if it is reasonably supported by the

---

[2]The State contends Martinez failed to preserve this issue for appeal because he did not argue it at the suppression hearing. We disagree. Martinez specifically alleged in his motions to suppress that his statements were made while he was in custody, after he invoked his right to counsel, and before he initiated further conversation with the police, and further alleged he was deprived of his right to counsel and did not make an intelligent and knowing waiver of that right. The trial court ruled on the motions to suppress and made express findings and conclusions regarding this ground for suppressing the statements. This preserved the issue for appellate review. *See* TEX. R. APP. P. 33.1(a).

record and is correct under any theory of the law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

### *Applicable Law*

In his point of error, Martinez asserts admission of his statements violated his rights under the Fifth Amendment to the United States Constitution and article 38.22, section 3 of the Texas Code of Criminal Procedure. However, Martinez has not presented any argument or legal authority in support of any violation of the Texas statute. Accordingly, we will analyze this point of error only for a violation of the federal constitution. *See* TEX. R. APP. P. 38.1(h).

To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, police may not conduct a custodial interrogation of a suspect who has requested the assistance of counsel. *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In order to invoke the protection of the Fifth Amendment, the request for counsel must be unambiguous; that is, the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). "[O]nce an individual in custody invokes his right to counsel, interrogation 'must cease until an attorney is present.'" *Minnick*, 498 U.S. at 150 (quoting *Miranda*, 384 U.S. at 474). Statements made in response to further police-initiated questioning without the presence of an attorney are inadmissible even if made after the suspect is again advised of his rights. *Minnick*, 498 U.S. at 150-151.

When a suspect has invoked his right to counsel, his unwillingness to deal with the authorities without the presence of counsel "is presumed to persist unless the suspect himself initiates further conversation about the investigation." *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004). However, a suspect is not "powerless to countermand his election" to speak only with counsel present and may do so by reinitiating contact with authorities. *Edwards*, 451 U.S. at 485; *see Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality op.); *Cross*, 144 S.W.3d at 526. To establish a suspect has waived his previously invoked right to counsel, the State must prove (1) the suspect himself initiated further communication with the authorities and (2) he thereafter validly waived his right to counsel. *Bradshaw*, 462 U.S. at 1045-46; *Cross*, 144 S.W.3d at 527. If the State meets this burden, "the suspect has countermanded his original election to speak to authorities only with the assistance of counsel . . . [and] [t]he *Edwards* rule is fully satisfied." *Cross*, 144 S.W.3d at 527; *see Bradshaw*, 462 U.S. at 1044-45.

For a suspect to "reinitiate" communication with authorities, the suspect's remarks must "represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045. Further, the impetus for the remarks must come from the suspect, not from police interrogation or conduct that is the functional equivalent of interrogation. *See Moran*, 213 S.W.3d at 922-23. In this context, "interrogation" "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see Moran*, 213 S.W.3d at 922-23. This definition focuses "primarily on the perceptions of the

suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301. In determining whether interrogation occurred, we do not look at statements made by the police in a vacuum; rather, we view them in light of the circumstances of the interaction between the suspect and the police on the occasion in question. *See Morris v. State*, 897 S.W.2d 528, 532 (Tex. App.–El Paso 1995, no pet.).

*Analysis*

The parties agree Martinez was in custody when he was interviewed, was informed of his rights before the interview began, and initially waived his rights. Martinez first argues he invoked his right to an attorney when he said, "Without a lawyer." The trial court did not find this to be a request for an attorney. We agree with the trial court. A mere "reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" does not require cessation of questioning. *Davis*, 512 U.S. at 459. Rather, to invoke the Fifth Amendment right to counsel, the suspect must unambiguously "express a definite desire" to speak to an attorney. *Dinkins v. State*, 894 S.W.2d 330, 332 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995). The statement, "Without a Lawyer," was a description of Martinez's circumstances, and would not reasonably have been construed as a request for an attorney. We therefore hold Martinez's statement was not an unambiguous expression of a desire to talk to an attorney. *See Davis*, 512 U.S. at 462 (holding suspect's statement, "Maybe I should talk to a lawyer," was not unambiguous articulation of desire for counsel).

After Martinez confessed his role in Ledesma's murder and provided Detective Angell with details about how the murder occurred, Martinez asked Detective Angell, "Can I have a lawyer

-9-

now?" Detective Angell interpreted this as an invocation of Martinez's right to counsel, and the trial court so found. However, the trial court also found that Martinez then reinitiated the conversation with Detective Angell and expressly waived his right to counsel. Martinez argues it was Detective Angell, not Martinez, who reinitiated the conversation by telling Martinez he had to go get a rights card and read his rights again.[3] We disagree. After Martinez had requested a lawyer, Martinez said, "So, I mean, Jay ordered this hit. I mean, what is . . ."[4] This statement clearly reflected a desire for further generalized discussion about the investigation. *See Bradshaw*, 462 U.S. at 1045. It was not until after this statement that Detective Angell told Martinez he could not speak to him any more unless he waived his rights, and when Martinez said, "Well, read me my rights then," the detective left to get a rights card. In this context, Detective Angell's response was entirely appropriate. *See id.* at 1042, 1046 (holding defendant reinitiated conversation by saying "Well, what is going to

---

[3]The State does not directly address Martinez's argument. Instead, it contends that because this occurred after Martinez had confessed to killing Ledesma, whether Martinez reinitiated the conversation is irrelevant. We disagree. The *Miranda* safeguards apply not only to confessions of criminal acts, but to any response to custodial interrogation that the prosecution may seek to introduce at trial. *Innis* 446 U.S. at 301-02 & n.5. Here, the State played for the jury the remaining redacted portions of the interview. If Martinez did not reinitiate the conversation after invoking his right to counsel, his subsequent statements were improperly admitted. That Martinez had previously confessed to the murder might be relevant to the issue of harm, but would not render his subsequent statements admissible.

[4]We note that Martinez does not argue this statement was made in response to interrogation by Detective Angell after Martinez had invoked his right to counsel. Because the trial court's findings did not address the issue, we imply a finding that Detective Angell did not further interrogate Martinez if it is supported by the record. *See Moran*, 213 S.W.3d at 922. The record does support such a finding.

Immediately after Martinez asked for counsel, he said, "Do what you gotta do. Take me to jail. You're gonna do that anyway." Before Martinez expressed his desire to continue with the interview, Detective Angell said, "You're going to go to jail for this murder and there's no way around that. You've got a warrant for your arrest." "The judge signed it and you've admitted to doing it." In the context of this interview, the trial court could reasonably have found Detective Angell's comments were not the functional equivalent of interrogation. As Martinez indicated, he knew he was going to jail, regardless of what else he might say. Martinez had previously been advised he was arrested on a murder warrant and Detective Angell had already told Martinez that he was going to be charged with murder that night no matter what Martinez said. Martinez had already confessed to pulling the trigger. Detective Angell's statements, iterating what was already known to Martinez, were not words he should have known were reasonably likely to elicit an incriminating response from Martinez. *See Innis*, 446 U.S. at 301.

happen to me now?"; when officer responded that suspect did not have to talk to him and that if he did it had to be of his own free will, and suspect stated he understood, there was no violation of *Edwards* rule). The trial court found that after Detective Angell obtained the rights card, Martinez knowingly, intelligently, and voluntarily waived his rights. This finding is supported by the record. Accordingly, the State met its two-part burden under *Bradshaw* and we hold Martinez's confession was not obtained in violation of his Fifth Amendment rights and the trial court did not abuse its discretion in admitting Martinez's statements into evidence.

## PHOTOGRAPH

Martinez next contends the trial court abused its discretion by admitting a picture of him into evidence, arguing the evidence was cumulative and irrelevant and that any probative value was substantially outweighed by the danger of unfair prejudice. Martinez objected to the introduction of the photograph, stating "the appearance of the . . . photograph" would "give evidence to the jury he's been arrested and he's in custody." Assuming the photograph should not have been admitted, any error was harmless unless its introduction affected Martinez's substantial rights. *See* TEX. R. APP. P. 44.2(b).

The photograph is of Martinez's head and shoulders on a white background. He appears to be wearing a white t-shirt with a burnt-orange over shirt. The over shirt is a v-neck, similar to scrubs worn by medical professionals. There are no markings of any kind on the photograph or the shirt and nothing in the photograph would indicate to the jury it was taken while Martinez was in custody. We agree with the trial court's response to Martinez' assertion that the photograph reflected he was in

-11-

custody, "You can't tell that from the photograph." Accordingly, we hold Martinez's substantial

rights were not affected and his second point of error is overruled.

**FACTUAL SUFFICIENCY**

In his final point of error, Martinez contends the evidence is factually insufficient to support the verdict. In a factual sufficiency review we view all of the evidence in a neutral light, giving "almost complete" deference to the jury's determination of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App.). We will reverse only if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust or if the evidence supporting the verdict is outweighed by the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We may not reverse for factual insufficiency when "the greater weight and preponderance of the evidence actually favors conviction." *Id.* at 417.

The jury was charged to find Martinez guilty if it found beyond a reasonable doubt that Martinez, acting alone or as a party, either (1) intentionally and knowingly caused Ledesma's death by shooting him with a deadly weapon, a firearm, or (2) with intent to cause serious bodily injury to Ledesma, committed an act clearly dangerous to human life that caused Ledesma's death by shooting him with a deadly weapon, a firearm. Martinez argues the evidence is factually insufficient to support a finding of guilt because most of the evidence presented at trial concerned the culpability of Joe "Jay" Guerrero; the evidence established there was "bad blood" between Guerrero and the victim, but no animosity between Martinez and the victim; and Yolanda Guerrero had a motive to lie.

The evidence supporting the verdict includes the details of Martinez's confession and the testimony of Ray Williams – a convicted felon who shared a cell with Martinez in November and December 2005. In his confession, Martinez admitted shooting Ledesma with a Glock pistol and

claimed the police would not find it because it had been reduced to a small piece of metal. He also confessed that two different people fired shots into Ledesma. A Taurus Para semiautomatic handgun was found in the apartment belonging to Joe and Yolanda Guerrero. The State's firearms examiner testified the Taurus fired six of the bullets found in Ledesma's body and ejected nine of the shell casings found at the murder scene. The firearms examiner testified the other twelve shell casings found at the scene were ejected from a Glock handgun and the six other bullets found in the body were fired from a Glock or a Kahr. The gun that fired these bullets and ejected these shell casings was not recovered.

Ray Williams testified Martinez told him that he and Ernie Garses killed Ledesma while Guerrero stayed outside. According to Williams, Martinez talked about the murder all the time and told Williams many details of the crime. These details include that Martinez used a Glock pistol to kill Ledesma, where in the trailer the shooting occurred, how the victim reacted when he was shot, and how Martinez took steps to make it appear the killing was the result of a "break in" by using a stone to break a window and knocking over items in the trailer. Martinez also told Williams he had told Guerrero he would kill him when they got to prison if Guerrero did not take the blame. Williams had been in custody since April 2005, and was serving a fifteen-year sentence for aggravated assault of a child. Williams testified he had not asked for or received any benefit for providing this information to the authorities, but that he did not want to testify.

The jury was provided an accomplice witness instruction in the charge regarding the testimony of Yolanda Guerrero. She testified she had been a co-worker of and friends with Ledesma. Ledesma often helped Yolanda with her children, and when Yolanda's husband, Joe "Jay" Guerrero, left town in May 2005, to live with another woman, Yolanda and her children stayed

with Ledesma in his trailer. Yolanda testified she and Guerrero had marital difficulties and he was abusive with her at times. Guerrero did not like the attention Ledesma paid to the children and told Yolanda he thought Ledesma was trying to take her away from him. Yolanda's friend Rebecca Garzes testified Guerrero told her he hated Ledesma and wanted to kill him.

Yolanda testified that Martinez and Ernest Garses were at her and Guerrero's apartment on the evening of September 12, 2005. The men were outside and Guerrero called to Yolanda and told her to get dressed because they were going to "handle" Ledesma. According to Yolanda, she and the three men took the Guerrero children to Rebecca Garzes's apartment, where Guerrero instructed Yolanda to call Ledesma and ask if she, Martinez, and Garses could come visit. Yolanda did so and Ledesma invited them to his house. Garzes testified she saw Guerrero and a third person in the Guerreros' minivan with Yolanda.

The three men and Yolanda drove to Ledesma's trailer. Yolanda testified she knew what was going to happen because all three men had guns and Guerrero had told her they were going to "get rid of" Ledesma. During the drive, Martinez told her that if she got in the way, she would be shot too. When they arrived at the trailer, Guerrero hid under a blanket in the van because he did not want Ledesma to see him. As Yolanda, Martinez, and Garses were approaching the door, Martinez told Yolanda that once the front door was opened and Ledesma turned his back, Martinez was going to shoot. And if he did not, she should to go inside and "play it off." According to Yolanda, Martinez knocked on the door and Ledesma invited them in. They went to the kitchen so Yolanda could get a glass of water. She testified that when she looked up and saw a "vicious look" on Martinez's face, she turned to go to the bathroom. As she got to the bathroom door, she heard shots. She turned and ran for the front door and saw Ledesma on the floor with blood on his head. Yolanda

testified she went outside, where Guerrero asked her if Ledesma was dead. She told him "yes" and Guerrero went inside. Yolanda testified she stayed in the minivan and could see Martinez rubbing the panel of the front door with a cloth and then pick up a rock and break a window next to the door of the trailer. Martinez later said they were trying to make it look like a robbery. After about five minutes, the three men came out and they all left. Yolanda testified she did not hear Guerrero threaten Martinez on the night of the murder, Martinez did not seem frightened that night, and instead seemed to be enjoying himself.

To counter this evidence, the defense called a television news reporter who testified she talked to Guerrero two times while he was in jail. Each time, Guerrero told her he and Yolanda had gone to Ledesma's trailer alone and that he was the person who killed Ledesma.

The greater weight and preponderance of the evidence in the record favors conviction and we cannot agree that the evidence was so weak as to make the verdict seem unjust.

Accordingly, we overrule Martinez's third point of error and affirm the trial court's judgment.

Steven C. Hilbig, Justice

PUBLISH