

Court Of Appeals

Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★ ★ ★ ★ ★

# MEMORANDUM OPINION

No. 04-08-00193-CR

Daniel E. **CAMPBELL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-9645
Honorable Sid L. Harle, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Sandee Bryan Marion, Justice
            Phylis J. Speedlin, Justice
            Marialyn Barnard, Justice

Delivered and Filed:  July 29, 2009

AFFIRMED

In four issues, Daniel Campbell appeals his manslaughter conviction.  We affirm the

judgment of the trial court.

### BACKGROUND

On August 15, 2006, Michelle Carrasco was found murdered in the vacant upstairs apartment

of a two-story duplex on Olive Street.  When the police arrived, four residents of the downstairs

apartment were outside, including Tonya Campbell, Daniel Campbell's wife. The residents told police that they heard a loud thump upstairs and then saw someone running away.[1] Campbell later arrived at the scene and attempted to comfort Tonya, who was having a panic attack. The four residents were interviewed by police that night. Tonya later told Campbell that the police wanted to talk to him about the murder, and the next day he called the police, who picked him up and brought him to the downtown station.

Upon arrival, Campbell was notified by Detective Manuel Nunez that he was under arrest due to an active municipal warrant. Nunez read Campbell his *Miranda* warnings, and Campbell answered "yes" when asked whether he understood his rights. The entire interview was video recorded with audio. Nunez proceeded to question Campbell concerning his whereabouts on the day of Michelle's death. Approximately an hour later, Campbell asked for an attorney; Nunez immediately stopped questioning him and escorted him to the restroom. Upon returning to the interview room, Nunez handcuffed Campbell and began asking him routine questions in order to complete the paperwork required for booking Campbell on the municipal warrant. When Campbell asked Nunez what he was being arrested for, Nunez told Campbell that he could not talk to him because he had requested an attorney. A few minutes later, Campbell asked Nunez for a piece of paper. Nunez reminded Campbell that he could not talk to him unless Campbell was willing to waive his rights. Nunez then asked Campbell whether he was waiving his rights, and he answered

---

[1] At trial, Sutherland "Kat" Harbour, one of the downstairs apartment residents, testified that Tonya had concocted the story about hearing a loud thump and seeing someone run from the apartment, and convinced everyone to lie to the police. Kat stated that she had been home with Tonya and the other two residents when Campbell, who also lived in the downstairs apartment, had come home saying he had seen someone leaving the upstairs apartment; he went upstairs to investigate, and found the body. Campbell was very calm and called the police, then fled, saying that he had a warrant and could not be there when the police arrived.

"yes." Campbell then told Nunez that he had intercourse with Michelle, a prostitute, but did not know what happened to her after he left the apartment.

Shortly thereafter, Nunez removed the handcuffs, left the interview room, and Sargent Thomas Matjeka entered. Matjeka had been watching most of the interview on closed-circuit television, but stopped once Campbell invoked his right to counsel because he thought the interview was over at that point. Matjeka told Campbell he would not charge him with a crime he did not commit. Matjeka also told Campbell he did not believe that he intended to kill Michelle. Campbell eventually confessed to causing the death of Michelle Carrasco and provided specific details that had not been released to the media, such as the location of the stab wound and the identification of a substance that was poured on her lower body. Campbell was released after taking police to the location where he disposed of the knife he used to stab Michelle; he also took police to the location where he hid the clothing he wore at the time of Michelle's death. He was arrested for the murder of Michelle Carrasco later that evening.

Prior to trial, Campbell sought to suppress his statement. After a hearing, the trial court denied Campbell's motion to suppress, and entered extensive findings of fact and conclusions of law stating that Campbell was provided with the requisite *Miranda* warnings and that he agreed to waive those rights, and that his statement was voluntarily given. The case was tried to a jury who determined that Campbell was guilty of manslaughter and sentenced him to eighteen years' imprisonment.

## DISCUSSION

In his first three issues,[2] Campbell contends the trial court erred in denying the motion to suppress his statement because: (1) the police did not fully read him the warnings required by article 38.22 of the Code of Criminal Procedure; (2) his statement was obtained after he clearly invoked his right to counsel; and (3) the jury heard him invoke his right to counsel, thereby permitting an inference of guilt.

### *Standard of Review*

We review the trial court's ruling on a motion to suppress evidence for abuse of discretion, using a bifurcated standard. *See Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997); *Martinez v. State*, 275 S.W.3d 29, 34 (Tex. App.—San Antonio 2008, pet. struck). We give "almost total deference" to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Guzman,* 955 S.W.2d at 89. We review *de novo* the trial court's determination of the law and its application of law to facts that do not turn upon an evaluation of credibility and demeanor. *Id.* When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling, so long as it finds some support in the record. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006); *see Moran v. State,* 213 S.W.3d 917, 922 (Tex. Crim. App. 2007). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any

---

[2] In his first three issues, Campbell alleges that both his state and federal due process rights were violated; however, because he presents no argument or authority that the Texas constitution provides different protection than the federal constitution, we will make no distinction between his federal and state claims, and therefore analyze these issues only for a violation of the federal constitution. *Arnold v. State*, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993); *Sturchio v. State*, 136 S.W.3d 21, 23 (Tex. App.—San Antonio 2002, no pet.).

theory of the law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

*Analysis*

Campbell first argues his statement was involuntary because he was not contemporaneously provided with the complete statutorily required language of section 38.22 of the Texas Code of Criminal Procedure, and because it was obtained as a result of police coercion and deception. The Code of Criminal Procedure ("the Code") provides that, "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion[.]" CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2005). Article 38.22 of the Code governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. Section 3 provides that an oral statement made by the accused during a custodial interrogation is inadmissable in a criminal proceeding against him unless an electronic recording of the statement is made after the accused has been given and waived the warning in Subsection (a) of Section 2. CODE CRIM. PROC. ANN. art. 38.22 § 3(a) (Vernon 2005). Section 2(a) requires that the accused be warned that: (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; (2) any statement he makes may be used as evidence against him in court; (3) he has the right to have a lawyer present to advise him prior to and during any questioning; (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and (5) he has the right to terminate the interview at any time. CODE CRIM. PROC. ANN. art. 38.22 § 2(a) (Vernon 2005).

Although Campbell contends he was not provided with the complete statutory warnings, a review of the recorded statement shows that he was given the warnings required by section 2 of article 38.22, and Campbell stated that he understood the warnings. As to whether Campbell's statement was the result of police coercion and deception, we examine the totality of the circumstances and ask whether Campbell's "will was overborne." *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). Nunez did tell Campbell that his DNA was found on the victim's neck, however, "a misrepresentation relating to an accused's connection to the crime is the least likely to render a confession involuntary." *Green v. State*, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996) (holding that misrepresentation by police that an eyewitness to the murder existed did not render confession involuntary because statement "directly relate[d] to appellant's guilt"). Likewise, the fact that Matjeka promised Campbell that he would not immediately be arrested for murder does not render the confession involuntary. Campbell was allowed to leave the police station and was arrested later that evening. Our review of the record fails to reveal evidence to suggest he was coerced into making a statement, or that the police had an improper motive to get Campbell to confess to the murder. Accordingly, the trial court did not abuse its discretion in finding that Campbell's statement was voluntarily made.

In his second issue, Campbell asserts the trial court erred in failing to suppress the videotaped statement because he clearly and unambiguously invoked his right to counsel and did not reinitiate the interview of his own accord. If, at any time during an interview, an accused requests counsel, police interrogation must cease until a lawyer has been made available or the accused himself initiates further communication, exchanges, or conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). The

*Edwards* rule was designed to protect an accused in custody from being badgered by police into giving up his right to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). A suspect, however, can waive his previously invoked right to counsel if: (1) the suspect himself initiates further communication with the authorities after invoking the right to counsel; and (2) after he reinitiates communication with the authorities, the suspect validly waives the right to counsel. *Cross v. State*, 144 S.W.3d 521, 526-27 (Tex. Crim. App. 2004) (citing *Bradshaw*, 462 U.S. at 1044-46). If this two-step procedure is met, then the *Edwards* rule is satisfied and "the suspect has countermanded his original election to speak to authorities only with the assistance of counsel." *Cross*, 144 S.W.3d at 527.

For a suspect to "reinitiate" communication with authorities, the suspect's remarks must "represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045; *Martinez*, 275 S.W.3d at 35. In *Bradshaw*, the police officer immediately terminated the interview after the suspect invoked his right to counsel. *Bradshaw*, 462 U.S. at 1041-42. Before or during the suspect's transfer from the police station to the jail, the suspect asked the officer, "Well, what is going to happen to me now?" *Id.* at 1042. The United States Supreme Court held that, "although ambiguous," the suspect's question "as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation," and therefore there was no violation of the *Edwards* rule. *Id.* at 1045-46. The Court of Criminal Appeals has held that the critical inquiry in determining whether a suspect initiated communication with law enforcement after invoking the right to counsel is whether the suspect was further interrogated before he reinitiated conversation with law enforcement officials. *Cross*, 144 S.W.3d at 529.

Here, once Campbell told Nunez that he wanted a lawyer, Nunez terminated the interview. Nunez escorted Campbell to the restroom. Upon returning to the interview room, Campbell was given a phonebook in which to find a lawyer. When Nunez returned to the interview room, Campbell informed him he could not afford a lawyer. Nunez handcuffed Campbell and began to ask him routine booking questions pertaining to the active municipal warrant. Questions normally attendant to arrest, custody, or administrative "booking" procedure do not constitute "interrogation" for purposes of *Miranda* or *Edwards*. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *Cross,* 144 S.W.3d at 524 n.5. Campbell then asked Nunez what he was under arrest for. Nunez replied that he could not talk to Campbell because he had requested an attorney. A few minutes later, Campbell asked Nunez for a sheet of paper. Nunez again told Campbell he could not talk to him unless Campbell wanted to waive his rights and talk to him. Campbell later explained that he asked for the paper because he wanted Nunez to write down his statement.

Campbell's questions to Nunez upon returning from the restroom reflect a desire to talk about the investigation, and therefore he reinitiated communication with the police. Additionally, because routine booking questions are not the equivalent of interrogation, Campbell was not further interrogated by Nunez before reinitiating conversation with Nunez. *See Cross*, 144 S.W.3d at 529. Thus, giving deference to the trial court's factual findings, we hold that the trial court did not abuse its discretion in determining that Campbell initiated communication with Nunez. Because Campbell initiated communication with Nunez, the first prong of *Edwards* has been satisfied. *Id.* at 527. Further, Nunez told Campbell he did not have to talk to him, and asked whether he wanted to waive his rights; Campbell clearly answered in the affirmative. Thus, the second prong of the *Edwards* test was satisfied. *Id.* Accordingly, we overrule Campbell's second issue.

Campbell next argues the trial court abused its discretion when it allowed the jury to hear Campbell invoking his constitutional right to an attorney when the DVD was played. The State responds that Campbell waived this argument by not objecting to the complained of portions of the DVD on these grounds. *See* TEX. R. APP. P. 33.1. Alternatively, the State maintains there was no error in admitting evidence of Campbell's invocation of his right to an attorney because Campbell voluntarily reinitiated communication with Detective Nunez, waived his rights, and then gave a statement confessing to causing the death of Michelle Carrasco. We agree.

Evidence of invoking the right to counsel is inadmissible as evidence of guilt. *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991). Applying similar reasoning, courts have also held that the invocation of the right to remain silent cannot be admitted as evidence of guilt. *See Cooper v. State*, 961 S.W.2d 222, 226 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). However, there is no error where the defendant subsequently waives the previously invoked right. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004) (holding that appellant waived his post-arrest right to silence when he agreed to give a written statement); *Salazar v. State*, 131 S.W.3d 210, 215 (Tex. App.—Fort Worth 2004, pet. ref'd) (noting that appellant was required to maintain post-arrest silence in order to complain of improper comment on post-arrest silence). Accordingly, we hold the trial court did not err in failing to suppress the recorded statement, including Campbell's initial invocation of the right to counsel where he subsequently waived that right. Campbell's third issue is overruled.

Lastly, Campbell contends the trial court abused its discretion in denying Campbell's motion for an instructed verdict because the evidence was insufficient to support the conviction of the offense as charged. At the close of evidence, Campbell moved for an instructed verdict, contending

the evidence was insufficient to support conviction of murder by stabbing or choking. The trial court overruled the motion. The indictment alleged that Campbell caused the death of Michelle Carrasco by stabbing her with a knife and choking her with his hands; the charge was submitted in the disjunctive. Campbell contends the evidence at trial showed that the cause of death was strangulation from behind by ligature; however, the State's theory of the case was that Campbell first stabbed Michelle Carrasco, and when it was apparent she was still alive, choked her with his hands from the front. Campbell maintains the State failed to prove either means of death because the evidence showed a ligature was used and there was no evidence Michelle would have died from the stab wound alone.

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence. *Gallardo v. State*, 281 S.W.3d 462, 472 n.7 (Tex. App.—San Antonio 2007, no pet). In performing a legal sufficiency analysis, we review all the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found beyond a reasonable doubt all of the elements of the offense. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury, as the trier of fact, is the sole judge of the credibility of witnesses and of the strength of the evidence. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999); *Jennings v. State*, 107 S.W.3d 85, 88 (Tex. App.—San Antonio 2003, no pet.). Because it is the province of the jury to determine the facts, any inconsistencies in the testimony should be resolved in favor of the jury's verdict. *Fuentes*, 991 S.W.2d at 271; *Jennings*, 107 S.W.3d at 88. In reviewing the denial of a directed verdict, it is not the appellate court's duty to "reweigh the evidence from reading a cold record but to 'position itself as a final, due process safeguard ensuring only the rationality of the

factfinder.'" *Williams v. State*, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996) (quoting *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995)).

At trial, the medical examiner who performed an autopsy on Michelle testified that the cause of death was strangulation and a stab wound to the chest. He could not confirm which occurred first. He stated that the stab wound would not have resulted in instantaneous death, but was a rapidly fatal wound. He further testified that a ligature was used to strangle Michelle, and that although he could not say whether hands were or were not used, it was most likely that the strangulation was effectuated by a ligature. He acknowledged that a necklace could be used as a ligature. The medical examiner also testified that the evidence was consistent with the victim being choked by hands.

In his statement to police, Campbell said that Michelle had sex with him in exchange for drugs. Afterwards, she asked for money, and when he refused, she became angry and came at him with a knife. During the course of their struggle, he stabbed her with the knife. He then admitted to squeezing her around the neck because he was angry with her for making him stab her. He stated that Michelle wore a chain or necklace around her neck, which he later threw in a dumpster. He also threw out her shorts, shirt, and sandals. He admitted to pouring "cooking stuff" on Michelle to get rid of the DNA because they had had intercourse.

Reviewing the evidence in the light most favorable to the jury's verdict, we conclude there was legally sufficient evidence from which a rational factfinder could find beyond a reasonable doubt that Campbell intentionally and knowingly caused the death of Michelle Carrasco by stabbing or choking. The medical examiner could not rule out the use of hands to achieve strangulation and Campbell stated that Michelle wore a chain or necklace around her neck, which could be used as a

ligature. Therefore, the trial court did not err in overruling the motion for instructed verdict. Campbell's fourth issue is overruled.

The judgment of the trial court is affirmed.

Phylis J. Speedlin, Justice

DO NOT PUBLISH