

# NUMBER 13-09-00166-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JEREMY MIERA,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 186th District Court
### of Bexar County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Yañez and Garza
### Memorandum Opinion by Chief Justice Valdez

A jury found appellant, Jeremy Miera, guilty of capital murder, and because the State did not seek the death penalty, the trial court assessed punishment at life imprisonment. *See* TEX. PENAL CODE ANN. §§ 12.31(a)(2), 19.03(a)(2) (Vernon Supp. 2009). By eight issues, Miera contends that: (1) this Court does not have jurisdiction to consider his appeal; (2) the trial court erred by denying his motion to suppress statements

given to police; and (3) the trial court erred by denying his motion for mistrial. We affirm.

## I. BACKGROUND[1]

In the early morning hours of May 17, 2006, San Antonio police executed an arrest warrant for Vincent Jesamy after receiving information regarding his involvement in three separate aggravated robberies that occurred on May 7, 2006, that resulted in the deaths of two individuals—Juan Cerda and Gregory Stewart. While executing the warrant, detectives on the scene spoke to Miera and, realizing that he might have also been involved in the robberies, asked Miera if he would come to the San Antonio Police Department to give a statement. Miera agreed and was transported to the police station where he was taken into an interview room and questioned.

After initially denying any involvement in the May 7 robberies, Miera admitted to Sergeant Thomas Matjeka that he was present at the robberies and that he shot Cerda. After Miera spoke to Sergeant Matjeka, he was taken home at approximately 7:30 a.m. Based on the information Miera gave to Sergeant Matjeka, police secured a warrant for Miera's arrest and, approximately four hours after being taken home, Miera was arrested. Miera was then taken back to the San Antonio Police Department and placed in a different interview room, where he was advised of his *Miranda* rights and Detective Cheri Estrada conducted a formal interrogation. *See generally Miranda v. Arizona*, 384 U.S. 442 (1966). During the interrogation by Detective Estrada, Miera again confessed to shooting Cerda.

Prior to trial, Miera filed a motion to suppress a DVD showing a statement given to Sergeant Matjeka.[2] In his motion, Miera alleged, among other things, that his statement was obtained in violation of his Fifth Amendment right against self-incrimination an in

---

[1] Because Miera does not challenge the sufficiency of the evidence supporting his conviction, only a brief recitation of the facts is necessary. *See* TEX. R. APP. P. 47.1, 47.4.

[2] Although Miera was questioned by several police officers, only part of his interview was recorded. The recording begins after Sergeant Matjeka's questioning had begun.

2

violation of article 38.23 of the Texas Code of Criminal Procedure. *See* U.S. Const. amend. V; Tex. Code Crim. Proc. Ann. arts. 38.21, 38.23 (Vernon 2005).

At the hearing on the motion to suppress, Detective Jesse Salame testified that he was among the group of law enforcement officials who executed Jesamy's arrest warrant. Detective Salame stated that at approximately 3:00 a.m. on May 17, 2006, a group of law enforcement officers surrounded the home where they believed Jesamy resided.[3] While arresting Jesamy, Detective Salame encountered Miera, whom he recognized as a person whose "name had come up" in the investigation and that police "wanted to talk to." Detective Salame asked Miera, "Would you be willing to come down and talk to us?", and Miera "didn't ask what it was about" and "didn't seem put out by it at all"; instead, Miera "readily agreed" and was transported to the police station by "Gang Unit" officers.

Once at the station, Miera was interviewed by Detective Devon Lambert in an interview room with a closed, but unlocked door. While they spoke, Detective Lambert told Miera, "You're free to leave. No one is keeping you here." Detective Lambert interviewed Miera for approximately two hours, and Miera denied any involvement. During the interview, Miera was allowed to make phone calls. Detective Lambert testified that Miera was not in custody or under arrest and that he never threatened or coerced Miera during the interview.

Sergeant Matjeka also testified at the suppression hearing. Sergeant Matjeka was present when Miera arrived at the police station and saw "officers . . . walking in front of Mr. Miera, he was behind them out of their sight. He was not handcuffed. He was not being led or escorted. The officers never touched him. He was essentially not in custody and free to roam about as he wanted to." Sergeant Matjeka stated that he spoke to Miera after

---

[3] This residence also appears to have been Miera's home.

3

Detective Lambert and began his questioning by telling Miera that "he was not under arrest" and "was free to leave at any time." Sergeant Matjeka "told [Miera] he could leave on his own or we would take him anywhere that he wanted to go." Miera "agreed to stay and answer some questions."

According to Sergeant Matjeka, the DVD reveals that he made forty-two statements to Miera during the interview informing Miera "about his being free to leave, not being under arrest and going home." During the interview, Miera left the interview room and used the restroom in a public area of the police station. Sergeant Matjeka stated that Miera had to wave to get his attention to be allowed to re-enter the homicide investigation area of the police station.

During the interview, Sergeant Matjeka took a few breaks and left the room; Miera used the phone six times during these breaks. At one point, Miera told Sergeant Matjeka that his mother wanted him to get a lawyer. Sergeant Matjeka then "specifically asked [Miera] if he wanted a lawyer." Miera responded, "I want to tell you everything." Sergeant Matjeka testified that he then inquired, "You want to talk to me right now without a lawyer? And [Miera] said he did." Miera later admitted that he shot Cerda. Miera was then taken home and, later that day, a warrant was issued and Miera was arrested.[4]

Miera testified at the suppression hearing. Miera stated that he "was not free to leave" when he was questioned by police. According to Miera, Sergeant Matjeka began the interview by calling him a "bitch" and saying that Miera "wasn't going to waste his time." Miera also insisted that, although he was allowed to go to the restroom, Sergeant Matjeka escorted him and watched as he used the restroom.

After the hearing, the trial court denied Miera's motion to suppress. The case

---

[4] The DVD corroborates Matjeka's testimony regarding his questioning of Miera.

proceeded to trial, and the jury convicted Miera of the capital murder of Cerda and sentenced to life imprisonment. *See id.* §§ 12.31(a)(2), 19.03(a)(2). This appeal ensued.

## II. JURISDICTION

This case was transferred from the Fourth Court of Appeals to this Court pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005). Texas Government Code section 73.001 provides that "[t]he supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer." TEX. GOV'T CODE ANN. § 73.001. "The court of appeals to which a case is transferred has jurisdiction of the case without regard to the district in which the case originally was tried and to which it is returnable on appeal." *Id.* § 73.002(a) (Vernon 2005).

By his first three issues, Miera contends that this Court lacks jurisdiction to hear his appeal because: (1) section 73.001 of the Texas Government Code violates the Equal Protection Clause of the United States Constitution "because it does not give proper effect to the voters of Texas who elect the justices of the intermediate appellate courts," *see* U.S. CONST. amend. XIV; (2) the transfer order is unconstitutional due to a conflict between the Texas Constitution and chapter 73 of the Government Code; and (3) the transfer order is unconstitutional because it is a void exercise of legislative authority over the judiciary in violation of the Separation of Powers provision found in Article 2, Section 1 of the Texas Constitution, *see* TEX. CONST. art. II § 1. Thus, Miera's first three appellate issues do not concern an error at the trial court level but rather concern an action of the Texas Supreme Court taken after a notice of appeal was filed with the Fourth Court of Appeals. Although Miera requests that we transfer his case back to the Fourth Court of Appeals, the State argues that Miera failed to preserve his docket equalization complaints or, alternatively,

5

that such complaints are not ripe for appellate review.

Recently, this Court, as well as two of our sister courts, have held that complaints regarding a transfer order and the constitutionality of section 73.001 must be preserved for appellate review by following the proper procedure for requesting transfer of an appeal from one court of appeals to another. *Fernandez v. State*, No. 13-09-168-CR, 2010 WL 3279394, at **8-9 (Tex. App.–Corpus Christi Aug. 19, 2010, no pet. h.) (mem. op., not designated for publication); *Simmons v. State*, No. 07-07-0282-CR, 2009 WL 2341921, at *2 (Tex. App.–Amarillo July 30, 2009, pet. ref'd) (mem. op., not designated for publication); *Arocha v. State*, No. 08-07-00108-CR, 2009 WL 1883733, at *5 (Tex. App.–El Paso June 30, 2009, pet. dism'd) (mem. op., not designated for publication). To properly raise a complaint about the transfer of a case:

> [t]he party requesting a transfer should file a copy of the motion to transfer in each of the two courts of appeals, asking that, when the motion is forwarded to the Supreme Court, each court of appeals advise the Supreme Court in writing whether it has any objection to the proposed transfer. Any briefs in favor of the proposed transfer should also be filed in each court of appeals and forwarded with the transfer motion. [The Supreme Court] will then have the motion, the briefs, and the comments of the two courts of appeals in determining whether to grant the motion to transfer.

*Fernandez*, No. 13-09-168-CR, 2010 WL 3279394, at **8-9 (quoting *Arocha*, 2009 WL 1883733, at *5 (quoting *Miles v. Ford Motor Co.*, 914 S.W.2d 135, 137 n.2 (Tex. 1995))).

Miera was notified of the transfer of his appeal from the Fourth Court of Appeals to this Court, and there is no indication that Miera availed himself of the above procedure or that it was unavailable to him. Because Miera failed to avail himself of an established procedure, which potentially could remedy the alleged constitutional violations, he has failed to preserve the complaints raised by his first, second, and third issues. *See* Tex. R. App. P. 33.1; *see also Fernandez*, 2010 WL 3279394, at **8-9; *Trevino v. State*, No. 07-07-0266-CR, 2009 WL 4913598, at *1 (Tex. App.–Amarillo Dec. 21, 2009), *pet. stricken*, No.

PD-0285-10, 2010 WL 2125004 (Tex. Crim. App. May 26, 2010) (mem. op., not designated for publication); *Simmons*, 2009 WL 2341921, at *2; *Arocha*, 2009 WL 1883733, at *5. Accordingly, we overrule Miera's first, second, and third issues.

### III. MOTION TO SUPPRESS

By his fourth, fifth, and sixth issues, Miera contends that the trial court erred by denying his motion to suppress the DVD showing part of his interview with Sergeant Matjeka. By his seventh issue, Miera argues that the trial court erred in denying his motion to suppress his post-arrest statement made to Detective Estrada.

## A.    Standard of Review

We review the trial court's ruling on a motion to suppress evidence for abuse of discretion, using a bifurcated standard. *See Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997); *Espinoza v. State*, 185 S.W.3d 1, 3 (Tex. App.–San Antonio 2005, no pet.). "At a suppression hearing, the trial judge is the sole judge of the credibility of the witnesses and of the weight to be given their testimony." *Espinoza*, 185 S.W.3d at 3 (citing *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991)). Therefore, we view the evidence in the light most favorable to the trial court's ruling, affording almost total deference to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Herrera v. State*, 241 S.W.3d 520, 526-27 (Tex. Crim. App. 2007); *Espinoza*, 185 S.W.3d at 3. We review de novo the court's application of the law to the facts. *Herrera*, 241 S.W.3d at 527; *Espinoza*, 185 S.W.3d at 3.

## B.    Was Miera in Custody?

By his fourth issue, Miera contends that the trial court erred in denying his motion to suppress his statement to Sergeant Matjeka because it was an unwarned statement

7

obtained as a result of custodial interrogation and, thus, was given in violation of his Fifth Amendment right against self-incrimination. *See* U.S. CONST. amend. V; *Miranda*, 384 U.S. at 444; *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) ("Unwarned statements obtained as a result of custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief."). By his fifth issue, Miera contends that the trial court erred in denying his motion to suppress his statement to Sergeant Matjeka because it was given when "Miera was in custody and was not advised of, nor provided an opportunity to waive, his right against self incrimination, rendering the statement inadmissible under the Texas Code of Criminal Procedure." *See* TEX. CODE CRIM. PROC. ANN. arts. 38.21, 38.23 (Vernon 2005). The State urges that we overrule Miera's fourth and fifth issues because he was not in "custody" when questioned by police.

"A person is in custody if, under the totality of the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Herrera*, 241 S.W.3d at 525; *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996). The initial determination of custody depends on the objective circumstances of the interrogation, not the subjective views of the police or the person being questioned. *Stansbury*, 511 U.S. at 322; *Dowthitt*, 931 S.W.2d at 254; *State v. Vasquez*, 305 S.W.3d 289, 294 (Tex. App.–Corpus Christi 2009, pet. ref'd). "When a person voluntarily accompanies officers to an interview, and he knows or should know that the police officers suspect he may be implicated in the crime under investigation, he is not 'restrained of his freedom of movement' and is not in custody." *Vasquez*, 305 S.W.3d at 294 (quoting *Shiflet v. State*, 732 S.W.2d 622, 630 (Tex. Crim. App. 1985)). However, a noncustodial interview may escalate into a custodial interrogation because of police conduct during the encounter.

8

*Id.* (citing *Dowthitt*, 931 S.W.2d at 255).

The Texas Court of Criminal Appeals has outlined four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255. Some of the factors to be considered in determining whether a person is in custody include: (1) whether the suspect arrived at the place of interrogation voluntarily; (2) the length of the interrogation; (3) whether the suspect's requests to see relatives and friends are refused; (4) the degree of control exercised over the suspect; and (5) whether a "pivotal admission established custody." *Espinoza v. State*, 185 S.W.3d 1, 3 (Tex. App.–San Antonio 2005, no pet.).

Because of the trial court's unique ability to judge the demeanor of the witnesses, we give great deference to its findings of fact, including a finding of whether custodial interrogation occurred. *See Espinoza*, 185 S.W.3d at 4-5; *Garza v. State*, 34 S.W.3d 591, 593 (Tex. App.–San Antonio 2000, pet. ref'd). After conducting a hearing on Miera's motion to suppress his statement to Sergeant Matjeka, the trial court found, in pertinent part:

> 1. A warrant for the arrest of Vincent Jesamy was executed . . . . While conducting the arrest, Detective Salame located Jeremy Miera at the residence.
>
> . . . .
>
> 3. Mr. Miera was asked if he would be willing to go to the police station and talk to detectives. Mr. Miera "readily agreed" to come to the police station to be interviewed.

4.  Mr. Miera was transported to the station with officers from the Gang Unit who were also on the scene.

5.  Mr. Miera was not handcuffed.

6.  Mr. Miera was not placed under arrest, nor told he was in custody.

7.  At the time he was brought to the police station, Mr. Miera was considered a witness, not a suspect.

8.  Once at the police department, Mr. Miera was placed in an interview room, which is standard procedure when the detectives need to speak with somebody.

9.  During the time that Detective Salame was with Mr. Miera, he never placed Mr. Miera in custody, or tell [sic] him he was under arrest, or not free to leave.

10.  Mr. Miera was initially interviewed by Detective Lambert.  That initial interview was not videotaped.  At that inital interview, Mr. Miera was not in custody.

11.  The record reflects that Detective Lambert testified at the Motion to Suppress hearing that he "admonished [Mr. Miera] that he was in custody and that he was free to leave when he wanted."  The [c]ourt finds that, in light of the other evidence in the record, this was either an inadvertent misstatement by Detective Lambert, or a mistake in the record.  It is clear to the [c]ourt that the Detective's intentions were to indicate to the [c]ourt that he admonished Jeremy Miera that he was _not_ in custody and that he was free to leave as he states numerous times after the initial statement concerning the defendant being in custody.

. . . .

13.  Detective Lambert informed the defendant, more than once, that he was not in custody and that he was free to leave.

14.  The door to the interview was unlocked, and during periods of the interview the detective left Mr. Miera alone.  Mr. Miera was permitted to make phone calls.

. . . .

16.  Sergeant Thomas Matjeka of the San Antonio Police Department was present when Mr. Miera was brought to the police station.  Mr. Miera was not handcuffed; he was not being led or escorted; the officers never touched him.  Sergeant Matjeka stated that Mr. Miera was not in custody and free to roam about as he wanted to.

. . . .

18. The [c]ourt finds that Sergeant Matjeka admonished the defendant that he was not under arrest and that he was free to leave at any time. The [c]ourt finds that Sergeant Matjeka informed the defendant that he could leave or they could take him anywhere he wanted to go. Sergeant Matjeka asked the defendant if he would be willing to stay and answer some additional questions.

19. The [c]ourt finds that the defendant voluntarily remained at the police station to answer additional questions by Sergeant Matjeka, although he was properly informed of his right to leave.

20. Mr. Miera used the phone six times during the course of the interview.

. . . .

22. The DVD of the interview clearly depicts numerous statements by the detective to the defendant informing the defendant that he was free to leave and would be going home after the interview.

(Emphasis in original; citations to the record omitted.) The trial court's findings of fact are supported by the record. Based on these findings, the trial court concluded that: (1) Miera was never placed in custody; (2) Miera was not physically deprived of his freedom; (3) Miera was never told that he could not leave; and (4) "[a] reasonable person would not have considered himself in custody if in Mr. Miera's situation."

In the present case, Miera "readily agreed" to accompany police to the station to be interviewed. Although Miera was transported to the station by police, he was not placed under arrest, told he was in custody, or placed in handcuffs. Upon arriving at the station, Miera was free to "roam about" and several police officers told him numerous times that he was not under arrest and was free to go home. Instead of choosing to leave, Miera sat in an unlocked interview room where he was questioned by police for approximately two hours. During this time, he freely left the interview room to use a public restroom in the station and made phone calls to his mother. After the interview was complete, police

11

transported Miera back to his home. Based on the record before us, we find that the trial court did not err in concluding that Miera was not in custody. *See Estrada v. State*, 313 S.W.3d 274, 294-95 (Tex. Crim. App. 2010) (holding that appellant was not in custody where: (1) appellant voluntarily rode with detectives to the police station to give a statement; (2) questioning by police lasted approximately five hours; (3) police told appellant several times that he was free to leave; (4) appellant acknowledged that he did not "have to be [t]here anymore"; and (5) appellant stated several times that he wanted to leave and go home); *Espinoza*, 185 S.W.3d at 3-5 (concluding that appellant was not in custody where appellant: (1) voluntarily accompanied a detective to the police station to give a statement; (2) was never placed under arrest or in handcuffs; (3) walked freely in the hallways of the station; (4) was told during the interview several times that she was there voluntarily and could leave at any time; (5) was interviewed for four hours; (6) was permitted to leave at the end of the interview; and (7) was not denied the opportunity to speak to a friend or relative). Because Miera was not in custody while being questioned, the failure to advise him of his rights did not render the statements inadmissible under *Miranda* or violate his right against self-incrimination. *See Estrada*, 313 S.W.3d at 295; *Espinoza*, 185 S.W.3d at 4-5.

Additionally, we note that an accused's statement may be used in evidence against him if it was freely and voluntarily made without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21. The trial court found that Miera's statements were voluntary and that the police who questioned Miera did not threaten or coerce him. The record supports the trial court's finding. *See Alvarado v. State*, 912 S.W.2d 199, 211-12 (Tex. Crim. App. 1995). In light of the foregoing, we overrule Miera's fourth and fifth issues.

**C.     Right to Counsel**

By his sixth issue, Miera contends that the trial court erred in denying his motion to suppress "because the police continued questioning him after he requested a lawyer." "To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, police may not conduct a custodial interrogation of a suspect who has requested the assistance of counsel." *Martinez v. State*, 275 S.W.3d 29, 34 (Tex. App.–San Antonio 2008), *pet. stricken*, No. PD-1094-08, 2009 WL 82362, at *1 (Tex. Crim. App. Jan. 14, 2009) (citing *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). Assuming, without deciding, that Miera clearly expressed his desire to contact an attorney, as previously discussed, Miera was not in custody. Thus, the *Edwards* standard requiring termination of all police interrogation once an attorney is requested is not applicable in this case. *See Brosette v. State*, 99 S.W.3d 277, 282 (Tex. App.–Texarkana 2003, pet. dism'd). We overrule Miera's sixth issue.

## D.    Second Statement

By his seventh issue, Miera contends that the trial court erred in denying his motion to suppress his second statement—the statement made during the post-arrest interrogation conducted by Detective Estrada—"because the first statement was taken in violation of the United States Constitution and the Texas Code of Criminal Procedure, and the [a]ppellant's second statement should have been excluded under the 'fruit of the poisonous tree' doctrine."

After giving his statement to Sergeant Matjeka, Miera was transported home. Later that day, an arrest warrant was obtained and Miera was arrested and brought back to the police station where he was interrogated by Detective Estrada. Detective Estrada formally *Mirandized* Miera before speaking to him. On appeal, Miera does not argue that the warnings given by Detective Estrada were inadequate; instead, he asserts only that his

13

second statement should have been excluded because his first statement was taken in violation of the United States Constitution and the Texas Code of Criminal Procedure. Because we have concluded that Miera's first statement was not taken in violation of either the United States Constitution or the Texas Code of Criminal Procedure, we overrule Miera's seventh issue. *See Moseley v. State*, 223 S.W.3d 593, 598 (Tex. App.–Amarillo 2007), *aff'd*, 252 S.W.3d 398 (Tex. Crim. App. 2008) (holding that trial court did not err by failing to suppress statements as "fruit of the poisonous tree" where appellant's initial confession was voluntary).

### IV. COMMUNICATION WITH JUROR

By his eighth issue, Miera asserts that the trial court erred in denying his motion for mistrial.

### A. Pertinent Facts

During the defense's case-in-chief, the trial court learned that family members of Gregory Stewart, an alleged victim on the night of the robberies, had given a small card to a juror.[5] The card contained Stewart's picture, a bible verse, and the following information:

> Patrolman
> Gregory Dean Stewart
> Beeville City Police
> End Of Watch
> May 15, 2006

The trial court held a hearing to determine the communication's affect on the juror. At the hearing, the juror stated that during a lunch break from trial two days earlier, a man and woman gave her a card and said, "This is in memory of our son and we hand it out to everybody." The juror stated that she was not wearing her glasses and could not tell what

---

[5] Prior to trial, Jesamy was tried and convicted for Stewart's death. Although the jury in Miera's trial heard evidence that both Cerda and Stewart died as a result of the actions of Miera and Jesamy, Miera was only tried for the death of Cerda. Evidence that Stewart was a police officer was excluded from Miera's trial.

the card said, so she responded, "okay" and "stuck it in [her] pocket and walked out." Upon

noticing Stewart's parents in the courtroom two days later, the juror took the card out of her

pocket, saw Stewart's name on it, and informed the bailiff. The juror told the trial court that

she only saw Stewart's name on the card and that she did not know what Stewart's

occupation had been. She also stated that she did not share any information about the

card or the contents of the card with any of the other jurors and that she was "[a]bsolutely"

certain that she would be able to disregard the card and reach a true verdict based on the

evidence presented at trial.

Stewart's mother informed the court that she hands out cards in memory of her son

"to everyone." Stewart told the court that, although she had noticed that the woman she

gave a card to at lunch was wearing a juror identification tag, she "did not recognize her

as a member of this jury." After Stewart's mother spoke, the trial court denied Miera's

motion for mistrial.

**B.      Analysis**

At trial, Miera's defense counsel moved for a mistrial "for violation of fair trial and

due process under the Sixth Amendment." *See* U.S. CONST. amend. VI (guaranteeing a

defendant the right to a trial by an impartial jury). However, on appeal, Miera contends that

the communication violated article 36.22 of the Texas Code of Criminal Procedure. *See*

TEX. CODE CRIM. PROC. ANN. art. 36.22 (Vernon 2006) (providing that "[n]o person shall be

permitted to be with a jury while it is deliberating. No person shall be permitted to converse

with a juror about the case on trial except in the presence and by the permission of the

court"). Because Miera's complaint on appeal does not comport with his objection at trial,

this issue has not been preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Swain*

*v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (providing that "[a]ppellant's global

15

statements in his pretrial motion to suppress were not sufficiently specific to preserve the arguments he now makes on appeal").  Accordingly, we overrule Miera's eighth issue.

### V. CONCLUSION

Having overruled all of Miera's issues on appeal, we affirm the judgment of the trial court.

_____

ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
30th day of August, 2010.

16