NUMBER
13-08-00731-CR

 

                                        COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI
- EDINBURG

                                                                     


 

ABRAHAM MAR,                                                                            Appellant,

 

v.

 

THE STATE OF TEXAS,                                                                
Appellee.

                                                                     


 

On appeal from the 357th
District Court

of Cameron County,
Texas.

                                                                     


 

MEMORANDUM OPINION

 

                  Before
Justices Rodriguez, Benavides, and Vela

                      Memorandum
Opinion by Justice Benavides

 








Appellant,
Abraham Mar, appeals his conviction for attempted capital murder for shooting a
police officer.[1]
 See Tex. Penal Code Ann. §§
19.03 (Vernon Supp. 2009), 15.01 (Vernon 2003).  Mar filed a pre-trial motion
to suppress a confession he gave to the police, which the trial court denied. 
Mar then pleaded guilty.  The jury assessed his punishment at ninety-nine
years’ imprisonment in the Texas Department of Criminal Justice’s Institutional
Division and a fine of $10,000.  

By
three issues, Mar challenges the trial court’s ruling on the pre-trial motion
to suppress, arguing that: (1) the trial court should have suppressed his
confession because he did not understand his rights and because the police
officers continued interrogating him after he validly invoked his right to
counsel; (2) his confession was involuntary because the police made promises to
him to induce the confession; and (3) the trial court failed to make findings
as to the voluntariness of his confession.  We affirm.

I.  Background

            On
June 25, 2008, a Cameron County grand jury indicted Mar for attempted capital
murder, alleging that Mar shot Carlos Diaz, a Harlingen Police Officer.  Mar
was apprehended in Matamoros, Mexico and was delivered to law enforcement
authorities in the United States.  Mar was then interrogated by Texas Ranger
Rolando Castañeda and Sergeant Miriam Anderson of the Harlingen Police
Department.  The interrogation was videotaped.

            Mar
filed a motion to suppress the resulting confession.  Mar alleged that his
confession was obtained in violation of Texas Code of Criminal Procedure
article 38.23; the Fourth, Fifth, Sixth, and Fourteenth Amendments to the
United States Constitution; and Article I, Section 9 of the Texas
Constitution.  See U.S. Const. amends.
IV, V, VI, XIV; Tex. Const. art.
I, §§ 9, 10, 19; Tex. Code Crim. Proc.
Ann. art. 38.22 (Vernon 2005).  On November 3, 2008, the trial court
held a hearing on Mar’s motion.

            During
the hearing, the trial court indicated on the record that it had reviewed the
videotaped confession.  The video is over an hour long.  At the beginning of
the interview, Sergeant Anderson referred to Mar as “mijo” and states to Mar,
“You know me.”  She read Mar his Miranda rights, asked him if he
understood them, and had him sign and initial a waiver of rights.  Mar
indicated that he had no questions.  

Initially,
Mar told the officers that he had children.  Sergeant Anderson reminded Mar
that she had known him for a long time and knew his mother, and she repeatedly
referred to him as “mijo” throughout the video.  Mar denied knowledge of the
shooting.  Sergeant Anderson stated that they “were not here to find out what
happened,” because she claimed that they already knew what happened.  She told
Mar that she was there to get his side of the story, to find out why “it
happened,” and to help Mar help himself.  Mar denied knowing what she was
talking about and claimed he had been in Matamoros, Mexico.

Ranger
Castañeda then told Mar that the police knew he was the shooter because there
was a video from the crime scene.  Mar asked if the officers would turn off the
video of the interview and stated he would talk to them off camera, but the
officers refused.  Ranger Castañeda then said: 

By you telling us what happened it’s
gonna help your case because you wanna see your
children . . . .  Instead of getting life in
prison, you might—you’ll get less.  I’m not promising anything, number one, I’m
not promising anything.  But your cooperation means a lot to the District
Attorney’s office.  And me personally, I will contact the District Attorney’s
office and tell them that you cooperated with us.  And the only way that I can
tell him that you cooperated—cooperated with us, is he has to see what you
said.  We’re trying to help you Abraham. . . .

 

Sergeant
Anderson explained again that the officers wanted to get Mar’s side of the
story.  Mar asked Sergeant Anderson to explain the allegations to him. 
Sergeant Anderson told Mar that a police car camera captured Mar exiting his
vehicle and grabbing a weapon.  She then said that the video showed Mar firing
the weapon at the police car, injuring a police officer.  

Ranger
Castañeda told Mar that he was being charged with attempted capital murder,
which carried a term of imprisonment of five to ninety-nine years.  Mar then
asked what he could do to avoid getting ninety-nine years.  Ranger Castañeda
answered:  “Where it will help you not get ninety-nine years—The District
Attorney’s office, as a matter of fact, they already called me.  They want to
know if you cooperated.  Your cooperation—first of all, I can’t promise you
anything, you gotta make that perfectly clear.”  Mar replied, “Yeah, I know.” 
Ranger Castañeda continued: 

But your cooperation will help you
reduce that sentence to the point that you might see your little girl and your
little boy when they’re teenagers or twenty years old or something.  But at
least you don’t have to worry about seeing them whey they’re fifty, sixty, seventy,
eighty years old. . . .  If I pick up the phone and
tell the District Attorney’s office and that Mar did not cooperate, what do you
think is going to happen?  Do you think—we’re going to show that videotape to
the jury. . . .

 

            Mar
continued to deny that he was the shooter.  He claimed that he had been
arrested on several occasions, but he stated that no charges were ever
brought.  He opined that he was always being blamed for things he did not do. 
Mar referred to himself as a “victim.”  He asked why, if the police had enough
evidence to convict him, did they need a confession?  Ranger Castañeda then
asked if Mar wanted to spend ninety-nine years in prison and stated that he did
not want Mar to do that much time.  Ranger Castañeda stated that if Mar went to
prison, his children would grow up being raised by their mother as a single
parent.  He stated he was just trying to keep Mar from spending ninety-nine
years in prison.  

            Again,
Mar explained that he was always a target of police investigations that were
unfounded.  He gave detailed examples of times he believed he was the victim of
police harassment.  Ranger Castañeda then said that he felt disrespected
because the videotape showed Mar committing the crime, but he would not admit
to it.  He stated that the officers did not need to talk to Mar—they had enough
evidence.  But he explained that at trial, when he was asked if Mar cooperated,
he would tell the jury that he gave Mar the chance to tell his side of the
story, and Mar lied instead of cooperating.

            Later
in the video, after more discussion by Mar of how he had been harassed by the
police, the following exchange occurred:

Ranger
Castañeda:             The bottom line.  Look, I understand what you’re saying,
but the bottom line is, there’s a good possibility you could go to prison for
the rest of your life if you don’t
cooperate. . . .  Abraham, you are not listening at
all.  You are not listening.  Listen to me.  Listen to me.  Cut the crap about
being the victim.  You shot that officer.  We got you on video.  You shot that
weapon.  We got your license plate on the car on the video.  We got the store
video doing the same—showing the same thing.  So cut the crap about being a
victim.  You’re not a victim on this one.  You might have been a victim of the
other ones.  But on this one where I’m involved, she’s involved, you are
a—you’re not a victim.  You shot that officer.  We wanna know why you shot the
officer.  And if you don’t wanna tell us, we’ll make sure we tell the District
Attorney to go ahead and go all the way for ninety-nine years.  Because I
guarantee you, you wanna get your high-powered attorney, get him.  All we have
to do is show that videotape to the jury, and you are gone.  You’ll never see
your children again.

 

Mar:                                        I
don’t even have money to get an attorney.

 

Sergeant
Anderson:            Be smart.

 

Ranger
Castañeda:             You will never see your children again if you keep on
saying that you’re a victim.  You might have been a victim on the other ones. 
I don’t know.  And it sounds like you might have been.  But the one case that
I’m concerned about is this one.  You were not the victim.  You pulled that
trigger and shot that officer.  You’re lucky that officer isn’t dead because if
that officer had been dead, and with that video, in eight to ten years you’d be
executed by lethal injection in the state of Texas.  And I’ve seen people being
executed before, and it ain’t pretty.  So here is your opportunity to see
your—at least see your children when you’re old enough to—that you’re not that
old that you can still walk and still play or see your grandchildren.  You make
that decision.  But you have got to understand something right now.  Look at
me.  You have got to understand something now.  We don’t need you to tell us
anything.  If you wanna go to prison for ninety-nine years, go.  We’re gonna
get you because that video—not because she said it or I said it.  That video
says everything.

  

            Mar
began talking about how he grew up in a bad neighborhood and explained that he
was abused as a child.  He again claimed that he had been harassed by the
police and repeatedly accused of crimes, but the charges were later dropped. 
Sergeant Anderson then stated again that this was Mar’s “chance” to do
something for his children and to “see them grow up.”  

Mar
then asked to talk to the prosecutor to find out what amount of prison time he
was facing and said he would “talk” after that.  He stated he wanted to talk to
the prosecutor to get an assurance about what would happen to him.  Sergeant
Anderson asked how Mar felt, and he stated he felt “dead.”  He stated again
that he wanted to talk to the district attorney or the judge, and he did not
“want to spend any more time with the questioning,” and the games and reverse
psychology.  Sergeant Anderson said that they were not playing mental games but
were trying to give him a chance to tell what happened.  Mar then stated he
understood the police believed they had evidence against him, but he wanted to
hear what the district attorney had to say.  When asked what he would say to the
prosecutor, Mar said he would “lace him up on what happened.”  The following
exchange then occurred:  

Ranger
Castañeda:           If I call the DA right now and say, Mr. DA, Abraham Mar
says he’ll be up front with us, tell us exactly what happened, but he needs to
know how much time he’s looking at.  And you’ll talk with us.

 

Mar:                                        Fuck
yes. . . .  And you’re making a promise on that thing
because . . . the DA’s gonna say how much time I’m gonna
get on that, and you know that’s against the law to make a promise.

  

Ranger
Castañeda:             No.  I can’t make a promise.  The DA can make a promise.

 

Mar:                                        What
the DA decides to do, I guess I’ll talk whatever.  I’ll say I’m not guilty or
I’m guilty.  I just wanna talk to the DA.

 

Ranger
Castañeda:             Ok.  If we don’t bring the DA over here, you’re not
gonna talk to us.  That’s fine with me. . . .  That’s
fine with me.  You’ll go to prison for ninety-nine years.  So don’t be trying
to negotiate with me.  Because I don’t negotiate.  Either you’re going to go to
prison for ninety-nine years, or you have the opportunity to go to prison for
twenty or thirty years.  Twenty-five, thirty, forty years.  With good time you
could be out in about twenty-five years.  Your children will be twenty-five
years old. . . .  And I could call the District
Attorney’s office, and he’s not gonna say well, uh, if he talks to us, I’ll
offer him twenty-five years, thirty years.  

 

Sergeant
Anderson:            It doesn’t work like that mijo.

 

Ranger
Castañeda:             It doesn’t work that way.  This is not law and order.

 

Mar:                                        Well
I don’t know.  You’re making it seem like law and order.

 

Ranger
Castañeda:             This is not law and
order. . . .  The good thing about this case, well the
great thing about this case, is you’re busted.  You’re busted bad.  I never had
a case where—you have been busted with a video
camera. . . .  If you tell us I shot that car and the
reason I shot that car is because of this, I can almost tell you you’re not
gonna serve ninety-nine years in prison.

 

Mar:                                        But
I’m gonna serve eighty-seven.

 

Ranger
Castañeda:             You’re not gonna serve eighty-seven years in prison,
because I’m gonna go, as a Texas Ranger, and she’s gonna go as a Harlingen
police sergeant, and say Mar cooperated with us.  He deserves a lower sentence
than ninety-nine years.   But, we’re not gonna negotiate.

 

Mar
then again referred to his prior arrests and alleged police harassment, and he
asked Sergeant Anderson to include his arrest history in his file.  The
following exchange occurred about whether Mar could speak to an attorney:

Mar:                                        Alright,
is there an attorney around right now?

 

Sergeant
Anderson:                        Not in here.

 

Mar:                                        Well
could I just talk to an attorney real quick?

 

Sergeant
Anderson:           You want to talk to an attorney?

  

Mar:                                        Real
quick, just real quick, and boom, after that, vamonos.  I’ll tell ya’ll
everything ya’lll wanna know.  I just wanna talk to an attorney real quick and
after that I’ll tell ya’ll whatever you wanna know.

 

At
this point, Sergeant Anderson reached under the table and began packing up her
things.  She muttered, “Ay mijo.  Ok.”  Ranger Castañeda immediately said, “You
do have a right to an attorney; You’re gonna get that right to an attorney.” 
Mar interrupted Ranger Castañeda and began talking again, crying as he spoke. 
Mar began explaining his background and told the officers that he had
psychiatric problems.  He said he felt like the police had been bullying him,
and he asked Ranger Castañeda how it would make him feel.  Ranger Castañeda
stated it would make him angry, and asked, “And then what happened?”  Mar claimed
that he “blacked out.”  Mar stated that he was “going to do the right thing,”
and he got on his knees in front of Sergeant Anderson.  He said he had already
lost his pride, and he stated that the police officer, although he did not
identify who, had arrested him on prior occasions.  Mar stated he knew he was
going to prison, and Ranger Castañeda asked if he wanted to go to prison for
ninety-nine years, and stated that Mar’s cooperation would help him.  Sergeant
Anderson stated that Mar was “doing the right thing.”  Mar indicated that he
merely wanted a lesser sentence.  

Mar
stated he believed the officer had pulled him over on purpose and was trying to
harass him.  He said he blacked out, and he didn’t know what happened.  Ranger
Castañeda stated that a black out was not going to help Mar.  He told Mar that
this case was different than others because there was a videotape, which would
be shown to the jury.  Ranger Castañeda then stated again, “The DA’s gonna get
life.  Do you wanna get life?  Or do you wanna get twenty-five, thirty years? 
We’re trying to help you.”  Mar then asked to use the phone.  Ranger Castañeda
stated that if Mar told them what happened, he could use the phone and have a
cigarette.  Mar then confessed to shooting the police officer.

At
the hearing on the motion to suppress, the defense called Ranger Castañeda as
its first witness.  Ranger Castañeda testified that he interviewed Mar on June
26, 2008.  The defense asked whether Ranger Castañeda informed Mar that his
cooperation would help him get a certain punishment in the case, and the
following exchange occurred:

[Defense
Counsel]:             Okay.  Now, as the interview progressed, did you inform
Mr. Mar that his cooperation in the interview would help him get a certain
punishment in his particular case in which you were questioning him?

 

[Ranger
Castañeda]:          What I did advise him that—I’m not in the position to
negotiate or to promise him anything.  I said that his cooperation could or
possibly help him in the future, but I am not in the position to be making any
deals with him.  I’m not an attorney.

 

[Defense
Counsel]:             Isn’t it true that you told him that you were going to
specifically speak to the District Attorney’s Office and that he would not get
99 years, that he would get less; isn’t that true?

 

[Ranger
Castañeda]:           I—I did advise him that, but I was utilizing deception as
an investigative tool at that point; and yes, I did tell him that.

 

[Defense
Counsel]:             And, in fact, that—you told him that several times; isn’t
that correct?

 

[Ranger Castañeda]:           Probably.

 

                        . . . .

 

[Defense
Counsel]:             Ranger Castañeda, the reason—the reason behind your
telling Abraham Mar that he would get a lesser sentence was, the purpose of
that was to elicit further testimony; isn’t that true?

 

[Ranger
Castañeda]:           If you viewed the whole tape, I talked to him about that
I’m not in the position to be negotiating with him, that I didn’t need his
testimony, just on the videotape of the shooting and other evidence, that I
didn’t need him; but I was giving him an opportunity to hear his side of the
story.

 

[Defense
Counsel]:             Well, Ranger Castañeda, I know that here you assert that
you didn’t need him and that you had a video and what not, but your actions,
your words to him were such that you were telling him that he would get a
lesser sentence, which flies in the face of your assertion now that you weren’t
negotiating with him; isn’t that true?

 

[Ranger
Castañeda]:           I wasn’t negotiating with him.  I was not.

 

[Defense
Counsel]:             Then explain to this Court why you were consistent and
persistent on telling him that he would receive a lesser sentence.

 

[Ranger
Castañeda]:           Like I told you before, I was using deception as an
investigative tool during my interview.  I’m not in a position to be
negotiating with the district attorney.  I’m not an attorney.

 

[Defense
Counsel]:             Well, you did make those assertions; didn’t you?

 

[Ranger
Castañeda]:           And if you remember in the beginning of the tape I said,
“I cannot promise you anything.  I could make the recommendations to the District
Attorney’s Office.”

 

[Defense
Counsel]:             But isn’t it true, Ranger Castañeda, that everything else
that you directed at Mr. Abraham Mar was consistent with you portraying
yourself of [sic] someone of authority, a Texas ranger, someone of authority
that was going to contact the District Attorney’s Office personally; isn’t that
correct?  Weren’t those your words?

 

[Ranger
Castañeda]:           Yeah.

 

. . . .

 

[Defense
Counsel]:             But you don’t dispute the fact that you told him on
several occasions that he would be receiving a lesser sentence because you were
going to use your position as a Texas ranger to speak to the D.A.’s Office;
isn’t that true?

 

[Ranger
Castañeda]:           I already said that, yes.

 

On
cross-examination, Ranger Castañeda denied promising Mar anything during the
interview and reiterated that he told Mar that he was not in a position to
negotiate with the District Attorney’s Office.  

            The
defense also questioned Ranger Castañeda about whether Mar invoked his right to
counsel during the interview:

[Defense
Counsel]:             In fact, at one point Mr. Abraham Mar advises you or
informs you that, along the lines that, “Do I have a right to talk to an
attorney?  I’d like to talk to an attorney.”  Isn’t that true?

 

[Ranger
Castañeda]:           That particular area you’re talking about, he advises
that he wants to talk to an attorney and that then he will speak to us.  And I
told him, “Yes, you have a right to an attorney.  We’re going to get you an
attorney.”  And I continued.  He waited a few seconds and continued and stated words
to the effect like, “puro chile.  I’m going to tell you the way it is.”

 

[Defense
Counsel]:             Well, isn’t it true that at the point where he requested
to speak to an attorney, the reaction—his response was more to a [sic] reaction
from, as you know, because were you there [sic]—

 

[Ranger
Castañeda]:           Uh-huh.

 

. . . .

 

[Defense
Counsel]:             After he made his unequivocal request for an attorney,
wasn’t your response one which would cause an individual to continue the line
of questioning?

 

[Ranger
Castañeda]:           No.  I told him that if he wanted an attorney I was going
to get him an attorney.  We started getting our paperwork, getting ready to
leave when he says that he was going to continue talking.

 

. . . .

 

[Defense
Counsel]:             And just to finalize, Ranger Castañeda, you don’t dispute
that Abraham Mar unequivocally requested guidance and to speak to an attorney?

 

[Ranger
Castañeda]:           I guess about—excuse me—about an hour into the interview
he says that he wanted to speak to an attorney.  And if you listen to the videotape,
I said, “You want an attorney.  I’m going to get you an attorney.”

 

[Defense
Counsel]:             And is it your testimony that after that request was
made, and you, you know, and you made the statement, you said that you did not
make any gesture, any remark that would lead a person to continue an
interrogation or give a statement?

 

[Ranger
Castañeda]:           Counselor, once he asked for an attorney, as far as I was
concerned, that interview was over.

 

On
cross-examination, Ranger Castañeda testified that after Mar requested an
attorney, Ranger Castañeda did not “ask him another question to elicit a
response regarding the actual event” and that Mar voluntarily initiated the
conversation.

            The
defense then called Sergeant Anderson to testify and questioned her about the
alleged promises made to Mar.  Sergeant Anderson could not recall the exact
statements made by Ranger Castañeda and referred defense counsel to the
videotape.  The defense then questioned Sergeant Anderson about Mar’s request
for counsel:

[Defense Counsel]:             During
the course of the interview, do you recall Mr. Mar making it clear to you and
Ranger Castañeda that he wanted to consult with an attorney?

 

[Sergeant
Anderson]:      I believe he made that comment.

 

[Defense
Counsel]:             Okay.  And that was not honored, was it?

 

[Sergeant
Anderson]:      I’m sorry?

 

[Defense
Counsel]:             That request was not honored on the part of you and Mr.
Castañeda?

 

[Sergeant
Anderson]:      I remember getting ready to either clean up or walk out when he
started talking again.

 

[Defense
Counsel]:             Do you recall making a sigh and saying, “Ay, Mijo,” like,
“Oh, son.”  Do you remember doing that immediately after he said, “I want to
speak to an attorney?”

 

[Sergeant
Anderson]:      I probably did.  I don’t know, sir.  It’s on the videotape.

 

[Defense
Counsel]:             What was the purpose of you saying, “Oh, son,” like
implying he was making a mistake?

 

[Sergeant
Anderson]:      Oh, I didn’t say that.

 

[Defense
Counsel]:             Well, that’s—what did you mean by saying, “Oh, son,”
like— 

 

[Sergeant
Anderson]:      I tend to use that word a lot.  I’ve worked with a lot of
children and I tend to use that word.  So I probably did say it.

 

. . . .

 

[Defense
Counsel]:             Once he said, “I want an attorney,” everything stopped. 
That means you don’t talk to him; you don’t suggest to him anything.  Do you
agree with me on that?

 

[Sergeant
Anderson]:      Oh, I wasn’t asking him or telling him anything.

 

[Defense Counsel]:             Well,
then why did you say, “Ay, Mijo?”

 

[Sergeant Anderson]:      It’s a form
of expression.  Like I said, I work with a lot of children.

 

[Defense Counsel]:             Yeah,
but you agree with me that that was a direct comment made to my client with
regard to his decision not to continue talking to you.

 

[Sergeant Anderson]:      No, sir.  I
would have to disagree.  I believe it was just my expression.

 

[Defense Counsel]:             And
really, what was the purpose of that expression?

 

[Sergeant Anderson]:      I do not—I
do that a lot.  Like I said, I work with a lot of children[,] and I have a
tendency to be, I guess, motherly.

 

At the end of the hearing, the trial
court denied the motion to suppress, stating on the record that:

The Court, as it has previously
indicated, the Court had reviewed the videotape so it could have a good context
of whatever the testimony was given.  The Court viewed the entire videotape. 
Based on the Court’s viewing of the tape, the testimony given, the Court will
deny the motion to suppress.

 

The trial
court did not issue a written ruling on the motion or file findings of fact and
conclusions of law.

            Mar
subsequently pleaded guilty to the charges of attempted capital murder and
evading arrest.  Punishment was tried to a jury, who assessed a sentence of
ninety-nine years’ imprisonment on the attempted capital murder
conviction.  The trial court certified Mar’s right to appeal the pre-trial
ruling on his motion to suppress.  This appeal ensued.

 

II.  Findings
of Fact and Conclusions of Law

            By
his third issue, Mar argues that the trial court failed to make findings as to
the voluntariness of his confession, as required by “constitutional and
statutory law.”  Thus, Mar asks this Court to remand to the trial court for the
entry of findings.  

            Mar
argues that his right to “due process” and article 38.22, section 6 of the Texas
Code of Criminal Procedure require the trial court to enter an order stating
its findings, citing Jackson v. Denno.  See 378 U.S. 368, 378-80
(1964) (“A defendant objecting to the admission of a confession is entitled to
a fair hearing in which both the underlying factual issues and the
voluntariness of his confession are actually and reliably determined.“); see
also Tex. Code Crim. Proc. Ann. art.
38.22, § 6.  Article 38.22, section 6 provides:

In all cases where a question is
raised as to the voluntariness of a statement of an accused, the court must
make an independent finding in the absence of the jury as to whether the
statement was made under voluntary conditions.  If the statement has been found
to have been voluntarily made and held admissible as a matter of law and fact
by the court in a hearing in the absence of the jury, the court must enter an
order stating its conclusion as to whether or not the statement was voluntarily
made, along with the specific finding of facts upon which the conclusion was
based, which order shall be filed among the papers of the cause. . . .

 

Tex. Code
Crim. Proc. Ann. art.
38.22, § 6.  

 

            The
State argues that Mar waived this complaint by failing to raise it in the trial
court.  We agree.  The record does not contain any request from Mar that the
trial court make these findings or an objection that the trial court issue
written findings on the motion to suppress.  The Texas Court of Criminal
Appeals has held that the right to findings under article 38.22, section 6 is
“a statutory ‘right’ which is forfeited by a party's failure to insist upon its
implementation.”  State v. Terrazas, 4 S.W.3d 720, 728 (Tex. Crim. App.
1999) (citing Marin v. State, 851 S.W.2d 275, 278-79 (Tex. Crim. App.
1993)).  Additionally, in Terrazas, the Texas Court of Criminal Appeals
held that Jackson v. Denno does not require a separate order stating
findings on the voluntariness of a confession.  Id.  Under these
circumstances, Mar has forfeited his third issue on appeal, and we overrule it.

III. 
Suppression of the Confession

            Mar argues that the trial court erred
by overruling his motion to suppress evidence because his confession was
obtained in violation of his right to counsel under the Fifth and Sixth
Amendments.  See U.S. Const.
amends. V, VI.  By his first issue, Mar argues that he did not understand his
rights and that the police officers continued interrogating him after he
validly invoked his right to counsel.  By his second issue, Mar argues that his
confession was involuntary because the police made repeated threats, promises,
and representations to him to induce the confession.  We disagree.

A.        Standard of Review

            We
review a trial court's ruling on a motion to suppress evidence under a
bifurcated standard of review.  Ford v. State, 158 S.W.3d 488, 493 (Tex.
Crim. App. 2005).  We do not engage in our own factual review; rather the trial
judge is the sole trier of fact and judge of credibility of the witnesses and
the weight to be given to their testimony.  State v. Ross, 32 S.W.3d
853, 855 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997).  Trial courts are given almost complete deference in
determining historical facts.  Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000).  We review the record to determine whether the trial
court's ruling is supported by the record and correct under some theory of law
applicable to the case.  Armendariz v. State, 123 S.W.3d 401, 404 (Tex.
Crim. App. 2003).  In the case before us, the trial court did not make explicit
findings of fact.  Under these circumstances, we view the evidence in the light
most favorable to the trial court's rulings and assume that the trial court
made implicit findings of fact supported by the record.  Ford, 158
S.W.3d at 493.

B.        Voluntary, Knowing, and Intelligent Waiver

Mar
argues that he did not validly waive his right to counsel because his comments
during the interrogation show that he did not understand that he would be
provided counsel if he could not afford one.  We disagree.

Article
38.22 of the Texas Code of Criminal Procedure prohibits the introduction of an
interrogation into evidence unless the accused is warned of his Miranda
rights and unless he knowingly, intelligently, and voluntarily waives those
rights. Tex. Code Crim. Proc. Ann.
art. 38.22, § 3(a) (Vernon 2005); Miranda v. Arizona, 384 U.S. 436, 444,
474-75 (1966).  “Waiver is shown as a matter of law with regard to pretrial
questioning if an accused (1) who has not yet retained or been appointed
counsel (2) decides voluntarily not to rely on his right to counsel and (3)
decides so with the understanding that he could remain silent and request a
lawyer and that the State could use any statement against him.”  Hunter v.
State, 148 S.W.3d 526, 533 (Tex. App.–Houston [14th Dist.] 2004, pet.
ref’d).  

At
the beginning of the interrogation, Sergeant Anderson informed Mar of his
rights, including his right to remain silent and to the appointment of counsel,
and Mar signed a waiver and indicated that he understood all of his rights. 
Later in the interview, the following exchange occurred:

Ranger
Castañeda:             The bottom line.  Look, I understand what you’re saying,
but the bottom line is, there’s a good possibility you could go to prison for
the rest of your life if you don’t
cooperate. . . .  Abraham, you are not listening at
all.  You are not listening.  Listen to me.  Listen to me.  Cut the crap about
being the victim.  You shot that officer.  We got you on video.  You shot that
weapon.  We got your license plate on the car on the video.  We got the store
video doing the same—showing the same thing.  So cut the crap about being a
victim.  You’re not a victim on this one.  You might have been a victim of the
other ones.  But on this one where I’m involved, she’s involved, you are
a—you’re not a victim.  You shot that officer.  We wanna know why you shot the
officer.  And if you don’t wanna tell us, we’ll make sure we tell the District
Attorney to go ahead and go all the way for ninety-nine years.  Because I
guarantee you, you wanna get your high-powered attorney, get him.  All we have
to do is show that videotape to the jury, and you are gone.  You’ll never see
your children again.

 

Mar:                                        I
don’t even have money to get an attorney.

 

We
disagree that this exchange necessarily demonstrates that Mar did not understand
his right to counsel.  In context, Mar’s statement could be interpreted as
merely a response to the officer’s challenge to go get a “high-powered”
attorney—not as an expression indicating that Mar did not understand his right
to appointed counsel. The trial court was entitled to resolve this fact issue
against Mar.  Carmouche, 10 S.W.3d at 327.  We overrule this
argument. 

C.        Initiation
of Interrogation After Invocation of the Right to Counsel and to Remain Silent

 

            Second,
Mar agues that after he invoked his right to counsel and to remain silent, the
officers initiated further interrogation when they should have terminated it,
violating the Fifth and Sixth Amendments.[2]
 Mar argues that he invoked his right to counsel, and the statement by Sergeant
Anderson, “Ay, mijo,” demonstrated her “distress at Abraham Mar’s request . . .
which clearly influenced Abraham Mar.”  Furthermore, Mar argues that he did not
initiate further communication with the police.  Mar argues that although he
“continued to vent his frustrations, he did not state he no longer wished to
speak to an attorney, nor did he recant his request.”  Rather, the conversation
regarding the offense was initiated by Ranger Castañeda.  The State, on the
other hand, argues that Mar initiated the further conversation.

             “Once
‘an accused has invoked his right to have counsel present during custodial
interrogation . . . [he] is not subject to further
interrogation by the authorities until counsel has been made available,’ unless
he initiates the contact.”  Montejo v. Louisiana, 129 S. Ct. 2079, 2085
(2009) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)).  “For
a suspect to ‘reinitiate’ communication with authorities, the suspect's remarks
must ‘represent a desire . . . to open up a more generalized discussion
relating directly or indirectly to the investigation.’” Martinez v. State,
275 S.W.3d 29, 35 (Tex. App.–San Antonio 2008, pet. stricken) (quoting Oregon
v. Bradshaw, 463 U.S. 1039, 1045 (1983) (plurality op.)).  The impetus of
the defendant’s remarks must come from the defendant, not from “police
interrogation or conduct that is the functional equivalent of interrogation.”  Id.
(citing Moran v. State, 213 S.W.3d 917, 922-23 (Tex. Crim. App. 2007).  “Interrogation”
includes “not only . . . express questioning, but also to any words or actions
on the part of the police (other than those normally attendant to arrest and
custody) that the police should know are reasonably likely to elicit an
incriminating response from the suspect.”  Rhode Island v. Innis, 446
U.S. 291, 301 (1980); see Moran, 213 S.W.3d at 922-23.  The Supreme
Court’s definition of interrogation focuses “primarily on the perceptions of
the suspect, rather than the intent of the police.”  Innis, 446 U.S. at
301.  “In determining whether interrogation occurred, we do not look at
statements made by the police in a vacuum; rather, we view them in light of the
circumstances of the interaction between the suspect and the police on the
occasion in question.”  Martinez, 275 S.W.3d at 35. 

            It
is undisputed that Mar invoked his right to counsel by asking for an attorney. 
Immediately after Mar requested to speak to an attorney, Sergeant Anderson
reached under the table to retrieve the waiver of rights that Mar had signed
and moved her chair back from the table, apparently packing up her things to
leave.  As she did this, she muttered, “Ay mijo.  Ok.”  Ranger Castañeda
immediately said, “You do have a right to an attorney; You’re gonna get that
right to an attorney.” 

            Mar
argues that Sergeant Anderson made an impermissible comment on his request for
counsel by making the comment, “Ay, mijo.”  Mar argues that this constituted
interrogation because it influenced him to confess.  We disagree.  

            Sergeant
Anderson referred to Mar as “mijo” throughout the video.  She agreed with Mar’s
counsel at the hearing on the motion to suppress that this statement means,
“son.”  She testified that it was merely an expression she uses because she
deals with children often.  But more importantly, immediately after she made
this comment, she began packing her things to leave, and within seconds, Ranger
Castañeda told Mar that he would get an attorney.  Mar immediately began
talking again.  Under the circumstances, the trial court was entitled to find
that Sergeant Anderson’s comment was not coercive and did not constitute
interrogation, based on the totality of the interactions between Mar and the
officers.  See Innis, 446 U.S. at 301 (finding that defendant was not
interrogated where the “conversation was, at least in form, nothing more than a
dialogue between the two officers to which no response from the respondent was
invited.”); Martinez, 275 S.W.3d at 35.  

            Mar
relies on Ochoa v. State, where the Texas Court of Criminal Appeals held
that a thirty-to-forty-minute conversation about marital problems, children,
and other matters, after which the defendant confessed, rendered the confession
inadmissible.  573 S.W.2d 796, 800 (Tex. Crim. App. 1978).  We note, however,
that the officer in that case expressly admitted that he engaged in the idle
conversation with the defendant as a way to “calm and relax him and to ‘get on
his good side,’ and to thus get appellant to make a statement.”  Id. 
This case is substantially different.  Here, Sergeant Anderson merely said,
“Ay, mijo,” and then Ranger Castañeda immediately told Mar he would get him an
attorney.    

            Additionally,
focusing on the defendant’s perspective rather than the intent of the police,
Mar did not testify at the hearing on the motion to suppress.  There is no
evidence in the record supporting his argument that, from his perspective, this
statement by Sergeant Anderson influenced his decision to initiate further
communication with the police.  See Moran v. State, 213 S.W.3d 917,
923 (Tex. Crim. App. 2007) (finding significant that the defendant never
testified that officer’s comment that he had spoken to other people caused him
to re-initiate conversation with the police and incriminate himself).   

            Next,
Mar argues that he did not initiate further communication, but rather, Ranger
Castañeda reinitiated the interrogation.  When Ranger Castañeda told Mar he
would get him an attorney, Mar immediately interrupted him and began talking
again, crying as he spoke.  Mar began explaining his background and told the
officers that he had psychiatric problems.  He said he felt like the police had
been bullying him, and he asked Ranger Castañeda how it would make him feel. 
Ranger Castañeda stated it would make him angry, and asked, “And then what
happened?”  Mar points out that Ranger Castañeda did ask a question before Mar
gave a confession, and he argues that before that question, Mar merely
discussed his background with the officers.  We hold that Mar’s statements
constituted an attempt to “open up a more generalized discussion relating
directly or indirectly to the investigation.”  Martinez, 275 S.W.3d at 35-36
(quoting Bradshaw, 463 U.S. at 1045)). 

            Throughout
the interview, the police told Mar that they did not need to know what happened,
but they just needed to know why.  From the beginning, Mar insisted that
he had been harassed by the police on numerous occasions.  When he finally
confessed, this was the reason he gave for shooting Officer Diaz.  Thus, it is
disingenuous for Mar to now argue that he was only discussing his background.  Accordingly,
we hold that Mar’s right to counsel was not violated.  See id.

Mar
also briefly argues that the interrogation violated his Fifth Amendment right
to remain silent.  See U.S. Const.
amend. V.  Mar argues that during the interrogation, he stated that he
did not “want to spend any more time with the questioning,” and this was an
invocation of his right to remain silent, which should have terminated the
interview.  The State counters that this was not an unequivocal and clear
invocation of the right to remain silent because the context shows that Mar
wanted to begin confessing.  We agree with the State.  

At
the time that Mar made this statement, he was requesting to speak to the
district attorney, and he expressly stated that he would talk to the district
attorney and “lace him up on what happened.”  An interrogating officer is not
required to stop his questioning unless the suspect's invocation of rights is
unambiguous.  Ramos v. State, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).
The officer is not required to ask clarifying questions, and “[i]f the
suspect's statement is not an unambiguous or unequivocal request [to terminate
the interview or to invoke the right to silence], the officers have no
obligation to stop questioning him.”  Davis v. United States, 512 U.S.
452, 461-62 (1994); see Berghuis v. Thompkins, 130 S. Ct. 2250,
2260 (2010) (“If an accused makes a statement concerning the right to
counsel “that is ambiguous or equivocal” or makes no statement, the police are
not required to end the interrogation, ibid., or ask questions to
clarify whether the accused wants to invoke his or her Miranda rights.”). 
“Ambiguity exists when the suspect's statement is subject to more than one
reasonable interpretation under the circumstances.”  Luna v. State, 301
S.W.3d 322, 325 (Tex. App.–Waco 2009, no pet.).  The trial court
implicitly found that Mar’s statement was ambiguous, and considering the
context, we agree.  Mar did not state that he no longer wished to speak to law
enforcement personnel.  Rather, he stated that he wanted to hear from the
district attorney about how much time he was facing, and then he would tell the
district attorney what happened.  We hold this is not a clear and unequivocal
invocation of the right to remain silent.  See Williams v. State, 257
S.W.3d 426, 434 (Tex. App.–Austin 2008, pet. ref’d) (concluding that
accused’s request to “terminate everything” was ambiguous because, in context,
“appellant appeared frustrated by his detention and was attempting to determine
whether he had been arrested.”); Hargrove v. State, 162 S.W.3d 313, 319
(Tex. App.–Fort Worth 2005, pet. ref’d) (holding that accused’s statement that
he wanted to “terminate it” was ambiguous and did not require the officer to
stop questioning); see also Davis v. State, No. AP-74393, 2007 WL
1704071, at *6 (Tex. Crim. App. June 13, 2007) (not designated for publication)
(holding right to remain silent was not unambiguously asserted where defendant
asked to terminate the interview to go home to see his mother, where the court
found the request could be construed as “a desire to continue the interview
once his concern about his mother had been satisfied.”).  We hold that Mar
initiated further conversation with the officers, and the confession did not
violate his right to counsel or to remain silent under the Fifth or Sixth
Amendments.  Accordingly, we overrule Mar’s first issue.  

C.        Promises by Law Enforcement

            Mar argues by his second issue that
his confession was rendered involuntary by promises from law enforcement. 
Specifically, he argues that, on numerous occasions throughout the
interrogation, Ranger
Castañeda told him he would speak to the district attorney on his behalf and
that Mar would not get a sentence of ninety-nine years if he cooperated.  While
Mar acknowledges that Ranger Castañeda also stated he could not make any
promises, Mar argues that this type of “deception” rendered his statement
involuntary.  We disagree.

            A statement is involuntary for due
process purposes when there is official, coercive conduct such that any
statement obtained thereby was unlikely to have been the product of an
essentially free and unconstrained choice.  Alvarado v. State, 912
S.W.2d 199, 211 (Tex. Crim. App. 1995); see also Valdez
v. State, No. 13-04-468-CR, 2005 WL 1953187, at *1-3 (Tex. App.­–Corpus
Christi Aug. 11, 2005, no pet.) (mem. op., not designated for publication).  A confession is rendered involuntary
by promises by law enforcement when the promises are (1) positive, (2) of some
benefit to the defendant, (3) made or sanctioned by someone in authority, and
(4) of such an influential nature that a defendant would speak untruthfully in
response thereto.  Sossaman v. State, 816 S.W.2d 340, 345 (Tex. Crim.
App. 1990), abrogated on other grounds by Graham v. State, 994 S.W.2d
651, 656 (Tex. Crim. App. 1999).  

            The
third element requires that the officer either have authority to make the
promise or appear to have such authority.  See Johnson v. State, 68 S.W.3d 644, 654-55 (Tex. Crim.
App. 2002); Henderson v. State, 962 S.W.2d 544, 564-65 (Tex. Crim. App. 1997). 
In Johnson, the Texas Court of Criminal Appeals found that the promises
made by the police officers did not render the defendant’s confession
involuntary because the officers “plainly
told appellant that the police could make no guarantees” and “could only relay
information to the court and prosecutor.”  68 S.W.3d at 654-55; see
also Henderson, 962 S.W.2d at 565 (“Because appellant knew Napier had no
authority, she could not have been improperly induced by any alleged promises.”).

            Here,
Ranger Castañeda clearly and unequivocally stated
to Mar that he did not have authority to make any promises with respect to the
sentence that Mar would receive, and Mar acknowledged as much.  Initially,
Ranger Castañeda told him that he might get less
time in prison by cooperating, but he qualified that by stating, “I’m not promising anything, number
one, I’m not promising anything.  But your cooperation means a lot to the
District Attorney’s office.  And me personally, I will contact the District
Attorney’s office and tell them that you cooperated with us.”  

            Ranger Castañeda told Mar that by talking with the police and
cooperating, it might help him avoid a ninety-nine year sentence.  He
immediately said, however, “I can’t promise you anything, you gotta make that
perfectly clear.”  Mar replied, “Yeah, I know.”  Later in the interview, Mar
asked to speak to the District Attorney and stated:  “And you’re making a
promise on that thing because . . . the DA’s gonna say how
much time I’m gonna get on that, and you know that’s against the law to make a
promise.”   Ranger Castañeda clearly stated, “I can’t make a promise.  The DA
can make a promise.”  Under these circumstances, we conclude that the trial
court did not err by impliedly finding that Mar was aware that Ranger Castañeda
did not have the authority to promise a lower sentence.  See id. 
Therefore, Mar has not established the third element of the Sossaman
test, and we overrule his second issue.

IV.  Conclusion

 

            Having overruled all of Mar’s issues,
we affirm.

 

 

________________________

GINA
M. BENAVIDES,

Justice

 

Do not publish.

Tex. R. App.
P.47.2(b)

 

Delivered and filed the

6th day of January, 2011. 









[1] Mar was also convicted of evading arrest
and was sentenced to two years’ imprisonment in a state jail facility and fined
$10,000.  See Tex. Penal Code Ann.
§ 38.04 (Vernon Supp. 2009).  He does not challenge that conviction in this
appeal.

 





[2] We note that Mar
does not argue that, if we find he initiated the contact, the police were
required to demonstrate a second, valid waiver of the right to counsel;
therefore, we do not consider that issue.  See Cross v. State, 144
S.W.3d 521, 526-27 (Tex. Crim. App. 2004) (citing Oregon v. Bradshaw,
463 U.S. 1039, 1045-46 (1983) (plurality op.) and holding that Edwards requires
proof that, after he reinitiates communication with the authorities, the
suspect validly waives the right to counsel).